1                      UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF CALIFORNIA

3                              --oOo--

4  UNITED STATES OF AMERICA,      ) Case No. 16MJ00088-MJS
                                  )
5            Plaintiff,           ) Fresno, California
                                  )
6       vs.                       ) Wednesday,
                                  ) August 9, 2017
7  AUSTIN LEE CAREY,              ) 9:00 a.m.
                                  )
8            Defendant.           )
   _____)

9

10                   TRANSCRIPT OF BENCH TRIAL
                 BEFORE THE HONORABLE MICHAEL J. SENG
11                 UNITED STATES MAGISTRATE JUDGE

12
   APPEARANCES:
13
   For the Plaintiff:            JOHN PRICE, ESQ.
14                               National Park Service
                                 Law Enforcement Office
15                               Post Office Box 517
                                 Yosemite, California 95389
16                               (209) 372-0243

17 For the Defendant:            REED B. GRANTHAM, ESQ.
                                 Office of the Federal Defender
18                               2300 Tulare Street
                                 Suite 330
19                               Fresno, California 93721
                                 (559) 487-5561
20
   Transcriber:                  Crystal Thomas
21                               Echo Reporting, Inc.
                                 4455 Morena Boulevard
22                               Suite 104
                                 San Diego, CA 92117
23                               (858) 453-7590

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

```
                                                                    ii
 1                            I N D E X
 2  WITNESSES:                  DIRECT   CROSS   REDIRECT   RECROSS
 3  Owen Conlow                    4      19        29        --
 4  Justin Buzzard                34      41        --        --
 5  EXHIBITS:                               IDENTIFIED   RECEIVED
 6  Plaintiff's
 7  1     Fabric                                15          16
 8  2     Harness                               12          12
 9  3     Helmet                                13          14
10  4     Goggles                               13          14
11  5     Wing suit                             13          14
12  6     Video                                  6           7
13  7     Photograph                            14          17
14  8     Photograph                            10          11
15
16
17
18
19
20
21
22
23
24
25
```

*Echo Reporting, Inc.*

1

1     FRESNO, CALIFORNIA WEDNESDAY, AUGUST 9, 2017 9:00 A.M.

2                        --oOo--

3        (Call to order of the Court.)

4            THE CLERK:  Court calls case number 16MJ88, United

5    States versus Austin Lee Carey.

6            THE COURT:  Appearances, please.

7            MR. PRICE:  Good morning, your Honor.  John Price

8    on behalf of the Government.

9            THE COURT:  Good morning, Mr. Price.

10           MR. GRANTHAM:  Good morning, your Honor.

11   Assistant Federal Defender Reed Grantham on behalf of Mr.

12   Carey, who is present.

13           THE COURT:  And good morning to both of you.

14           We are set at this time for trial of this matter.

15   Is the Government ready to proceed?

16           MR. PRICE:  Yes, your Honor.

17           THE COURT:  Is the Defense ready to proceed?

18           MR. GRANTHAM:  Yes, your Honor.

19           THE COURT:  Are there any preliminary matters we

20   need to address before we go forward?

21           MR. GRANTHAM:  I don't believe so, your Honor.

22           THE COURT:  All right.  How about do we have

23   witnesses in the courtroom, parties, witnesses who will be

24   called upon to testify that would have excluded while others

25   testified?

2

1          MR. PRICE:  Yes, your Honor.  We have one park

2   service employee who is not law enforcement.

3          THE COURT:  All right.  And will there be -- how

4   many witnesses will the Government call?

5          MR. PRICE:  Two, your Honor.

6          THE COURT:  Two.  One is a park service employee.

7   One is a ranger?

8          MR. PRICE:  Yes, sir.

9          THE COURT:  All right.  And will the ranger be the

10  client present at trial?

11         MR. PRICE:  Yes, your Honor.

12         THE COURT:  All right.  Very well.  I will ask the

13  park service employee -- I would ask you to have the park

14  service employee and anybody else who is going to testify

15  other than the parties to remain outside.  I apologize, but

16  we don't want you inadvertently to be influenced by

17  testimony that you hear from another witness.

18         So I will also direct counsel not to discuss the

19  contents of any testimony with -- with the witness and have

20  the parties not do that and have other witnesses not do

21  that.

22         All right.  That was the only preliminary matter

23  that I can think of.  So at this point I will ask if the

24  Government first, which has the burden of proof, would like

25  to make an opening statement?

3

1          MR. PRICE:  Yes, your Honor, very briefly.

2          THE COURT:  All right.  Please proceed.

3          OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

4          MR. PRICE:  Just in short, your Honor, I think

5 that we have a pretty clear case here.  In U.S. v. Alvarez,

6 as I outlined in our trial brief, the Ninth Circuit has

7 clearly established that base jumping is a violation of both

8 C.F.R. -- or Code of Federal Regulations 2.1783, air

9 delivery, and 2.3484, hazardous condition and disorderly

10 conduct.

11          We will show clear evidence that Mr. Carey was

12 found in a tree that could not be climbed or otherwise got

13 into and that Mr. Carey was wearing a base jumping harness

14 and was near other base jumping gear.  There's no other

15 possible explanation for the circumstances he was found in

16 other than some sort of air delivery by parachute.

17          Based on the Ninth Circuit case law, we think that

18 it's clear that Mr. Carey must be found guilty of both

19 counts.

20          THE COURT:  All right.  Thank you very much.  That

21 was indeed brief.

22          Does the Defense wish to give an opening statement

23 at this time?

24          MR. GRANTHAM:  Your Honor, we don't wish to give

25 an opening statement at this time.  We would reserve for our

4

1  closing.

2          THE COURT:  All right.  Very well.  Then we will

3  proceed with the evidence.  I will invite the Government to

4  proceed -- present its case and call its first witness.

5          MR. PRICE:  Thank you, your Honor.  The Government

6  will call Ranger Owen Conlow.

7          THE COURT:  All right.  Ranger, if you'll step

8  forward.  Stand up next to the witness box and remain

9  standing while you raise your right hand and take the oath.

10         OWEN CONLOW - PLAINTIFF'S WITNESS - SWORN

11         THE COURT:  Please take a seat.  Get yourself

12 reasonably comfortable.  Get that microphone where it's six

13 inches from your mouth or so so that you don't have to bob

14 and weave, and just speak in a normal tone of voice.  We are

15 recording this.  We want to make sure we get a clear

16 recording.  If you need anything, let me know.  If you need

17 water or anything like that, we'll get it for you.

18         THE WITNESS:  Thank you, your Honor.

19         THE COURT:  All right.  You may proceed.

20         MR. PRICE:  Thank you, your Honor.

21                 DIRECT EXAMINATION

22 BY MR. PRICE:

23 Q   Ranger, can you please state your name for the record.

24 A   Owen Conlow.

25 Q   And where are you currently employed?

5

1 A     Yosemite National Park.

2 Q     What is your job there?

3 A     I'm a law enforcement ranger.

4 Q     How long have you been employed there in that role?

5 A     I've been employed with Yosemite for a little over a

6 year, and I've been working as a law enforcement ranger for

7 about two years.

8 Q     And what kind of training have you received for law

9 enforcement?

10 A     I attended the Seasonal Law Enforcement Training

11 Academy in Santa Rosa.  It's about a 14-week program.

12 Q     And where are you normally assigned on duty as a law

13 enforcement ranger in Yosemite?

14 A     I work in the jail in the law enforcement office, so

15 generally patrol the valley but can patrol anywhere in the

16 park.

17 Q     And on the morning of September 6th, 2016, do you

18 recall where you were around 6:30 a.m.?

19 A     I was at La Comp Memorial.

20 Q     And what were you doing there?

21 A     Had just conducted a traffic stop.

22 Q     Is that -- to your knowledge, is that location within

23 the special territorial jurisdiction of the United States?

24 A     Yes, it is.

25 Q     And what happened after that traffic stop?

6

1  A    I was approached by a bystander who reported seeing a

2  parachute hit a tree in Housekeeping Camp.

3  Q    And how did you respond to that?

4  A    My partner and I had concluded the traffic stop, and we

5  drove the short distance to Housekeeping Camp and identified

6  the location where that had happened.

7  Q    What did you see at that campsite once you arrived

8  there?

9  A    Above two of the tent cabins in Housekeeping Camp, I

10 observed a large piece of fabric just stuck at the top of a

11 tree.

12 Q    Was there anything around the tents that was

13 noticeable?

14 A    Yes.  There was a -- a helmet on top of one of the tent

15 cabins, and there was a pair of goggles behind the tent

16 cabins.

17       MR. PRICE:  Okay.  Your Honor, at this time I

18 would like to show the witness a video marked as Government

19 Exhibit 6.

20       THE COURT:  Any objection?

21       MR. GRANTHAM:  No, your Honor.

22       THE COURT:  All right.  You may proceed.

23       MR. PRICE:  Ranger Conlow, please direct your

24 attention to the street.

25       (Government Exhibit 6 played in open court.)

7

1 BY MR. PRICE:

2 Q    So it's a relatively short video, but do you recognize

3 this video, Ranger Conlow?

4 A    Yes, I do.

5 Q    And what is it?

6 A    It's footage I took of the goggles I found behind the

7 tent cabin directly below the tree.

8 Q    And was that the -- or is this a fair and accurate

9 representation of the tree that you saw on that day?

10 A    Yes, it is.

11       MR. PRICE:  And then I would also like to show --

12 I'm sorry.  I would request that what has been marked as

13 Government Exhibit 6, this video, be moved into evidence as

14 Government Exhibit 6.

15       THE COURT:  Any objection?

16       MR. GRANTHAM:  No objection.

17       THE COURT:  It is admitted.  Exhibit 6 is admitted

18 into evidence.

19 BY MR. PRICE:

20 Q    So once you were at the scene, as you described, what

21 was your first -- what was the first thing you did?

22 A    My partner and I cleared the area.  We looked for -- we

23 looked for an individual associated with the parachute, and

24 we cleared the tent cabins that were immediately below and

25 surrounding the tree that the parachute was in.

8

1  Q    And did you find anyone associated with the parachute

2  at the base of the tree?

3  A    No, I did not.

4  Q    Did you at any time contact anyone associated with the

5  parachute?

6  A    Yes.  I called out to the top of the tree to see if

7  there were any individuals in the tree.

8  Q    And do you recall what you called out?

9  A    I called "Base Jumper, are you okay?"

10 Q    Why in that moment did you call "base jumper"?

11 A    I know there is a culture of base jumping that has used

12 various jump off points in Yosemite National Park, and based

13 on the report that a parachute had hit the tree, I assumed

14 that it was a base jumper that had collided with the tree.

15 Q    And do you know from your experience as a ranger about

16 particular areas where base jumpers jumped from in the past?

17 A    I know that Half Dome and Glacier Point and I believe

18 Taft Point have all been used at various times.

19 Q    And was this location you were at on this date

20 consistent with those kind of locations?

21 A    Yeah, it -- we are more familiar with the landing

22 zones, the meadows, and this was very close to Stillman

23 Meadow, which is a -- a common landing zone.

24 Q    Okay.  And do you see in the courtroom today the man

25 who you contacted in that tree?

9

1  A      Yes, I do.

2  Q      Can you identify him for the Court?

3  A      This gentleman right here.

4         THE COURT:  Pointing to the Defendant sitting next

5  to defense counsel, Mr. Carey.  Thank you.

6  BY MR. PRICE:

7  Q      And so you -- you discuss clearing the tents at the

8  base of the cabin.  Why did you feel the need to clear those

9  tents?

10  A      Because it was clear to me that there was still an

11  individual in the tree with more equipment and some of the

12  equipment had fallen down, and I didn't know how that

13  individual was affixed to anything in the tree.  I was

14  worried that the individual or more equipment would fall,

15  and it was early in the morning.  So there were still

16  visitors sleeping in some of the tent cabins.

17  Q      And did you personally observe any equipment falling?

18  A      I did.

19  Q      And can you describe that?

20  A      There was a harness that was thrown down at one point

21  during the contact by the individual in the tree.

22  Q      Okay.  Once you cleared the area, the 10 cabins, how

23  did you proceed from there?

24  A      We had already requested emergency medical response

25  because we weren't sure of the condition of the person in

10

1  the tree, and at that point we began speculating how to

2  assist the person getting out of the tree.  The paramedics

3  arrived, and one suggested using Yosemite's tree climbers.

4  Q    And why couldn't he climb out himself?

5  A    There were no branches in the lower portion of the

6  tree.  We estimated to be the lower 50 to 70 feet of the

7  tree didn't have any branches and didn't appear to be

8  climbable without specialized equipment.

9  Q    So was there any way that Mr. Carey could have gotten

10 in that tree besides by parachute?

11 A    I don't believe so, no.

12 Q    Were the tree climbers successfully able to get him out

13 of the tree?

14 A    Yes, they were.

15 Q    Okay.  At this time I'd like to show you what has been

16 marked as Government Exhibit 8.  It's in your binder in

17 front of you.  If you could flip to the very last shot.  Do

18 you recognize this picture?

19 A    Yes, I do.

20 Q    And what is it?

21 A    It's a still frame of footage from one of the body

22 cameras of the officers on scene.

23 Q    And is it a fair and accurate representation of what

24 you saw?

25 A    Yes, it is.

11

1         MR. PRICE:  Okay.  The Government is requesting

2 that what has been marked for identification as Government

3 Exhibit 8 be moved into evidence as Government Exhibit 8.

4         THE COURT:  Any objection?

5         MR. GRANTHAM:  No objection.

6         THE COURT:  You know, I would a little bit

7 information what it depicts.  Is that -- is that the tree

8 climber?

9         MR. PRICE:  Yes, your Honor, and I'd be happy to

10 ask for more exposition.  We will be describing it.

11         THE COURT:  It's not the Defendant being lowered?

12         MR. PRICE:  No, your Honor.  We will be discussing

13 more with our next witness.

14         THE COURT:  As to how that came about?

15         MR. PRICE:  Yes, your Honor.

16         THE COURT:  I mean, what I see is someone dangling

17 about four feet off the ground.

18         MR. PRICE:  I think that's accurate.

19         THE COURT:  All right.  No objection, it will be

20 admitted.  I'm not sure what it tells me, but --

21         MR. PRICE:  Okay.

22         THE COURT:  All right.  Thank you.

23         MR. PRICE:  Thank you, your Honor.

24 BY MR. PRICE:

25 Q   Okay.  And then I -- also I'm going to show you now a

12

1 physical piece of evidence that has been marked as

2 Government Exhibit 2.  Ranger Conlow, do you recognize this?

3 A    Yes, I do.

4 Q    And can you describe what it is?

5 A    It's the harness that the individual was wearing when

6 he was lowered from the tree.

7 Q    And is this different from the harness that dropped?

8 A    Yes, it is.

9 Q    How was this harness attached to the Defendant?

10 A    It went over the shoulders and around the waist and

11 buckled in the front.

12 Q    And was there any indication -- was there any

13 indication to you what the harness was designed for?

14 A    I researched it when I was putting it into evidence

15 based on the make and model, and it appeared to be used for

16 base jumping.

17        MR. PRICE:  The Government is requesting that what

18 has been marked for identification as Government Exhibit 2

19 be moved into evidence as Government Exhibit 2.

20        THE COURT:  Any objection?

21        MR. GRANTHAM:  No, your Honor.

22        THE COURT:  Exhibit 2 is admitted.  Government

23 Exhibit 2 is admitted.

24 BY MR. PRICE:

25 Q    I'm now going to show you what have been marked as

13

1 Government Exhibit 3, 4, and 5.

2          THE COURT:  Let's do one at a time.  I mean, as

3 you introduce them.

4          MR. PRICE:  Yes, your Honor.

5 BY MR. PRICE:

6 Q    Ranger Conlow, do you recognize this?

7 A    Yes, I do.

8 Q    Can you identify it?

9 A    It's the helmet that I located on top of one of the

10 tent cabins directly under the tree.

11 Q    Thank you.  And do you recognize this?

12 A    Yes, I do.

13 Q    And can you identify it?

14 A    Those are the goggles that I located directly behind

15 the tent cabins below the tree.

16          THE COURT:  And that's marked for identification

17 as?

18          MR. PRICE:  Government Exhibit 4.  Sorry, your

19 Honor.

20 BY MR. PRICE:

21 Q    And marked as Government Exhibit 5, Ranger Conlow, do

22 you recognize this?

23 A    Yes, I do.

24 Q    And can you describe it?

25 A    It's what I understand to be a wing suit that was

14

1 thrown from the tree during the contact.

2 Q    Okay.  And is there any indication what this is

3 designed for?

4 A    Yes.  Based on research I did afterward, it appears to

5 be for -- a wing suit for -- I'm not sure what the

6 terminology would be but so a person can glide through the

7 air.

8         MR. PRICE:  Okay.  At this time the Government

9 would move to introduce as evidence Government's Exhibit 3,

10 4, and 5.

11         THE COURT:  Any objection?

12         MR. GRANTHAM:  No objection, but just for

13 clarification, the helmet is Exhibit 3?

14         THE COURT:  Yes.  All right.  Exhibits --

15 Government Exhibits 3, 4, and 5 are admitted.

16 BY MR. PRICE:

17 Q    And then at this time I'd like to show a picture marked

18 as Government Exhibit 7, which, Ranger Conlow, you'll find

19 in your binder.  Do you recognize this photograph?

20 A    Yes, I do.

21 Q    Can you identify that?

22 A    It's a still frame from one of the officer body cameras

23 on scene immediately after the individual was removed from

24 the tree, depicting the harness and the clothing that the

25 individual was wearing.

15

1 Q    And is that the same harness that has been introduced
2 as Government Exhibit 2?

3 A    Yes, it is.

4 Q    Can -- and the last thing I'll ask of you, one last
5 piece of evidence.  I'll leave this partially closed, but do
6 you recognize this, marked as Government Exhibit 1?

7 A    Yes, I do.

8 Q    And can you identify it?

9 A    It's the piece of fabric that I believe is the
10 parachute that was in the tree.

11        MR. PRICE:  The Government is requesting to
12 introduce as Government Exhibit --

13        THE COURT:  All right.  Would you just restate
14 that?  I didn't hear all of that.  It is a piece of
15 fabric --

16        THE WITNESS:  That I believe is a parachute that
17 was located at the top of the tree.

18        MR. GRANTHAM:  Your Honor, I would just object as
19 to the lack of foundation.  I don't know how he knows that
20 this is the parachute that was in the tree.

21        MR. PRICE:  Understandable, your Honor.

22 BY MR. PRICE:

23 Q    Ranger Conlow, how -- how did you first come in contact
24 with this piece -- this item of evidence?

25 A    I observed it in the tree during the rescue of the

16

1 individual that was in the tree.

2 Q    And then how did it come into your possession?

3 A    I followed up the following morning with the same tree

4 climbing crew who was removing all the other items left in

5 the tree.  That was removed at that time from the top of the

6 tree.

7 Q    And did you recognize it to be the same piece of fabric

8 as you described it from one day to the next?

9 A    Yes, I did.  It appeared the same and was in the same

10 location in the tree when I arrived the following morning.

11 Q    And is there any way that it could have been a

12 different fabric in your mind?

13 A    No.

14        MR. PRICE:  Okay.  The Government is now

15 requesting to move into evidence what has been marked as

16 Government Exhibit 1.

17        MR. GRANTHAM:  No objection, your Honor.

18        THE COURT:  All right.  It will be admitted.

19 Exhibit 1 is admitted.

20        MR. PRICE:  Yes, your Honor.

21        And thank you, Ranger Conlow.  That is all the

22 Government has for you.

23        THE COURT:  I'm sorry?

24        MR. PRICE:  No more questions, your Honor.

25        THE COURT:  All right.  I don't know that Exhibit

17

1 7 was moved into evidence.

2          MR. PRICE:  I'm sorry, your Honor.

3 BY MR. PRICE:

4 Q    Exhibit 7, Ranger Conlow, is a picture that I showed

5 you.  This is -- can you identify it again just so we have

6 it?

7 A    It's a still frame from one of the officer's body

8 cameras on scene depicting the individual immediately after

9 he was removed from the tree, the items he was wearing,

10 including the harness.

11          MR. PRICE:  The Government moves to -- moves

12 Exhibit -- moves -- requests to move Exhibit 7 into

13 evidence.

14          MR. GRANTHAM:  No objection.

15          THE COURT:  All right.  Exhibit 7 will be

16 admitted.

17          MR. PRICE:  And, your Honor, may I have one

18 minute?

19          THE COURT:  You may.

20     (Pause.)

21 BY MR. PRICE:

22 Q    Ranger Conlow, I'm just going to ask you a few more

23 questions if that's okay.  So you described -- you mentioned

24 the tree climbers managed to get him down from the tree.

25 What happened then?

18

1 A    As he was being lowered out of the tree, shortly before

2 he was lowered to ground level, a paramedic contacted the

3 individual, asked him if he needed medical attention or if

4 he wanted to be seen by any medical personnel.  He denied

5 any medical attention and at that point was lowered the rest

6 of the way to the ground and placed under arrest.

7 Q    And how did you -- how did that happen?

8 A    My partner and I, as well as two other law enforcement

9 rangers on scene, closed in around the individual as he was

10 lowered down, placed our hands -- you know, placed him under

11 control and put him in handcuffs, moved him to our -- near

12 our patrol vehicle so that we could perform an search

13 incident to arrest and then moved him to the back of the

14 patrol vehicle.

15         MR. PRICE:  Thank you.  No more questions.  I

16 apologize.  One more question.

17         THE COURT:  That's all right.

18 BY MR. PRICE:

19 Q    When you were placing him in handcuffs, did you have to

20 remove anything from his person?

21 A    Yes.  We -- we placed him in handcuffs immediately as

22 he was lowered out of the tree, and then we had to remove

23 the handcuffs to remove some of his equipment, including the

24 harness depicted in Exhibit 7.

25 Q    And what did you place him under arrest for?

19

1  A    We placed him under arrest for aerial delivery and for

2  creating a hazardous condition.

3           MR. PRICE:  All right.  Thank you.

4           THE COURT:  All right.  Cross examination?

5           MR. GRANTHAM:  Thank you, your Honor.

6                      CROSS EXAMINATION

7  BY MR. GRANTHAM:

8  Q    Good morning, Ranger Conlow.  How are you?

9  A    Good morning, sir.  I'm well.  Thank you.

10 Q    So you mentioned that you've been a -- how long have

11 you been a ranger in Yosemite National Park?

12 A    I started in Yosemite National Park in June of 2016.

13 Q    June --

14 A    So a little over a year.

15 Q    And you had -- you had a reference to being law

16 enforcement for two years.  Where was -- where was the two-

17 year mark?

18 A    I was a law enforcement ranger at Golden Gate National

19 Park starting in late August of 2015.

20 Q    Okay.  Have you ever participated in the arrest of an

21 individual who's been charged with base jumping in Yosemite?

22 A    Other than the current case?

23 Q    Other than -- other than the case at hand, yeah.

24 A    No, I have not.

25 Q    So this is the first time arresting an individual for

20

1 base jumping in Yosemite?

2 A    Yes, sir.

3 Q    Have you ever base jumped yourself?

4 A    No, I have not.

5 Q    Not just in Yosemite but elsewhere?

6 A    No, I have not.

7 Q    On the date in question, which I believe is September

8 6, 2016, did you personally witness any parachutes in the

9 air that morning?

10 A    No, I did not.

11 Q    Did you personally witness Mr. Carey at any point in

12 the air?

13 A    I witnessed him above the ground.

14 Q    But not in a parachute?

15 A    I witnessed him with a parachute in the tree.  I was

16 not able to see, because of the distance, whether he was

17 connected to the parachute or not.

18 Q    All right.  That was my next question.  So you don't

19 know whether or not he was connected to the parachute at the

20 point when you -- when you saw him in the tree?

21 A    No, I do not know that.

22 Q    Did you have any -- did you see him disconnect himself

23 from a parachute or anything to that effect?

24 A    No, because of the distance in lighting, I was not able

25 to see specific details.

21

1 Q    Okay.  You didn't happen to have binoculars on you at

2 the time, anything like that?

3 A    I did not.

4 Q    So you weren't able to specifically see him up there at

5 the time?

6 A    Can you rephrase the question?

7 Q    Outside -- without enhanced mechanism such as

8 binoculars, you were able to see an individual in the tree,

9 correct?

10 A    Correct.

11 Q    But specifically you didn't have something like

12 binoculars to get an enhanced view of what the person looked

13 like or who was in the tree, correct?

14 A    Correct.

15        MR. GRANTHAM:  Your Honor, I'd like to -- if I may

16 approach the witness with a copy of his report.

17        THE COURT:  All right.  And I assume the

18 Government's already seen it.  And do you have a copy for

19 me?

20        MR. GRANTHAM:  I have a copy for everyone, your

21 Honor, and it's part of the discovery.

22        THE COURT:  You may.

23        THE WITNESS:  Thank you.

24 BY MR. GRANTHAM:

25 Q    Ranger Conlow, do you recognize this -- this document?

22

1  A    Yes, I do.

2  Q    And what is it?

3  A    It's my report as printed from the IMARS program.

4  Q    Does it appear to be an accurate representation of what

5  you wrote up?  It looks like it's dated the same date,

6  September -- actually, it's dated September 16th.  Does that

7  appear to be an accurate representation of what you wrote?

8  A    Yes, it does.

9  Q    If I could just direct you to -- it's a little

10 difficult because of the paragraphs here, but if we could

11 start with -- it's about midway down, "Carey stated that he

12 understood."  If you could read from "Carey stated he

13 understood" until the last part of the sentence, which is

14 "to be a wing suit apparatus."

15          THE COURT:  Do you want him to read that out loud

16 or to himself?

17          MR. GRANTHAM:  Read to himself will be sufficient.

18     (Pause.)

19 BY MR. GRANTHAM:

20 Q    And let me know when you've finished.  Have you

21 finished?

22 A    I've finished.

23 Q    You had stated on direct examination that at some point

24 Mr. Carey threw down a harness, and in your report you

25 appear to mention that -- quoting here -- "The area below

23

1 the tree at the time" -- okay -- "was in the process of

2 clearing the area below the tree at the time Carey

3 intentionally dropped a piece of equipment."

4     How do you know that he intentionally dropped it or

5 that he -- as you said on direct, that he threw something

6 down?

7 A     In the section that you asked me to read, I stated that

8 he stated that he intended to drop a piece of equipment.

9 That's how I knew that he intentionally dropped it.

10 Q     It says "Carey, that if he intentionally or

11 accidentally dropped equipment, he needed to yell 'falling'

12 loudly."

13 A     That's not contained within the part I was --

14 Q     Right.  I see.

15 A     -- understood to read.

16 Q     "Carey stated that he intended to drop equipment and

17 did so without any indication clear yelling."  Whether or

18 not he stated he intended to, do you have any knowledge that

19 he intended to drop it at the time?

20 A     Yes.  So he did state that he intended to drop

21 equipment.  He didn't call the word that I asked him to call

22 when he was going to drop equipment, and didn't give us time

23 to react when he dropped the equipment.

24 Q     On the whole, would you say that Mr. Carey was

25 compliant with your request?

24

1  A      No.

2  Q      And why would you say he wasn't compliant?

3  A      Because I gave him a very clear one-word statement to

4  yell when he was going to drop equipment.

5  Q      I guess when I say "your request," your request

6  throughout the interaction.  He wasn't disobeying what you

7  were saying?

8  A      Throughout the entire two-hour --

9  Q      Yes.

10  A      -- contact?

11  Q      I mean, he was responding to you, correct?

12  A      He was responding to us.

13  Q      Okay.  Now, so you stated earlier that you haven't ever

14  participated in the arrest of an individual who's charged

15  with base jumping.  Are you familiar with base jumping as an

16  activity generally?

17  A      Only based on Internet research that I've done.

18  Q      And what is your -- you stated on direct that you're

19  relatively familiar with some spots where at least

20  individuals land or where individuals jump off?

21  A      Yes.

22  Q      What is that based on?

23  A      Based on information given to me by other law

24  enforcement rangers and information I read in books about

25  death in Yosemite.

25

1  Q    Have you ever visited a location where base jumping
2  occurs for the purpose of seeing where people jump off?
3  A    Not for that express purpose.
4  Q    Is it a illegal to climb without a rope in Yosemite
5  National Park?
6  A    I don't know all the climbing regulations, but not to
7  my knowledge.
8  Q    Are you familiar with individuals in the park who climb
9  without ropes at high elevations so to speak, say on El Cap
10 or Half Dome, stuff like that?
11 A    Yes, I am.
12 Q    So it's an activity that is ongoing in Yosemite,
13 climbing, say, without ropes?
14 A    As far as I'm aware, yes.
15 Q    And that awareness is based on what exactly?
16 A    Based on articles I've read, places like outside
17 magazine, on rock climbers free soloing El Cap and things
18 like that.
19 Q    Are you familiar with people who climb some of these
20 faces without ropes but with a parachute strapped to their
21 back?
22 A    I'm not familiar with that.
23 Q    Okay.  So you're saying it would be illegal -- it would
24 be legal to climb a face in Yosemite without a rope, but if
25 an individual was wearing a parachute, would it be illegal

26

1  for them to deploy that parachute?

2  A    Is that two questions or one question?

3  Q    I guess to -- well, you've already stated that it's

4  legal, at least to your knowledge, to perhaps climb in

5  Yosemite without a rope.

6  A    Correct.

7  Q    Is it your understanding that it is illegal for an

8  individual to climb in Yosemite without a rope and then who

9  either by choice or by accident who fell off if they were

10 wearing a parachute, is illegal for them to deploy that

11 parachute?

12 A    It sounds to me like they would be doing something

13 illegal if they deployed a parachute after falling either

14 intentionally or unintentionally off of a rock face.

15 Q    Okay.  Were you -- and this goes without saying, but

16 you weren't present at the time when -- I guess the

17 speculation is that Mr. Carey was the individual who jumped.

18 You weren't present at the time that whoever jumped jumped,

19 if someone jumped?

20 A    I was not present at that time.

21 Q    So you don't have any idea about the person's intent at

22 that time?

23 A    I do not have any idea.

24 Q    Whether or not they jumped on purpose or whether or not

25 they jumped -- whether they fell or it was an accident or

27

1  emergency, something like that?  You wouldn't have any

2  knowledge of that?

3  A    I have no knowledge of that.

4  Q    Did you speak with anyone who would have knowledge of

5  that related to this case?

6  A    Of specific individuals related to this case?

7  Q    Of any witnesses who would testify or speak to whether

8  or not Mr. Carey had intentionally leapt off of a cliff?

9  A    Did I speak to any of those individuals?

10 Q    Yes.

11 A    I did not.

12 Q    Are you -- I guess you say you've been a law

13 enforcement ranger since June of 2016.  Have you ever been a

14 search and rescue ranger or anything to that effect?

15 A    I've been a law enforcement ranger since 2015.

16 Q    2015.  Pardon.  Sorry.

17 A    I am a search and rescue technician as well.

18 Q    Do you participate in search and rescue type

19 operations?

20 A    I do.

21 Q    In your experience, what is the most common type of

22 rescue that you guys engage in, to your -- just to your

23 experience, in your experience?

24 A    The most common is I believe lower -- lower extremity

25 injuries on the trails by, you know, relatively

28

1 inexperienced hikers.

2 Q    Is it -- is it true as well that there are a

3 significant number of individuals who either fall off of

4 some high object or maybe fall into a river?  Is that also a

5 common -- relatively common reason for fatality or

6 significant injury in the park?

7 A    In my year and a few months here, it does seem that

8 there have been some fatalities from people falling from

9 higher levels into the river, yes.

10 Q    What about falling off the edge of a precipice?

11 A    There have been some fatalities from that.

12 Q    Okay.  Are you familiar with -- you stated on direct

13 that you had speculated that Glacier Point could have been a

14 potential place where this activity began based on --

15 A    Correct.

16 Q    -- based on the landing of Stillman Meadow.  I think

17 that's what you stated on direct.

18 A    Correct.

19 Q    Are you familiar with the -- are you familiar with

20 Glacier Point?

21 A    Yes, I am.

22 Q    Are there railings at Glacier Point?

23 A    In some areas there are railings.

24 Q    Is the -- is the face of the cliff such at Glacier

25 Point that an individual could fall off the edge if they got

29

1 too close?

2 A    I'm not familiar.  I've never walked up to the edge and

3 looked off, but I have observed people climb over the

4 railings and get dangerously close to the edge, and I do

5 believe that they could easily fall off if they did.

6            MR. GRANTHAM:  That's all I have, your Honor.

7            THE COURT:  All right.  Redirect?

8            MR. PRICE:  Your Honor, may I have one minute?

9            THE COURT:  You may.

10       (Pause.)

11                    REDIRECT EXAMINATION

12 BY MR. PRICE:

13 Q    Thank you, Ranger Conlow.  Okay.  Can you describe for

14 us about how far from Glacier Point is it from this tree in

15 Housekeeping that we're talking about?

16 A    I'm honestly not sure.

17 Q    Okay.  Is it -- well, that's okay.  Is Glacier Point,

18 to your knowledge from being in the park as a ranger or Taft

19 Point, common areas for rock climbing?

20 A    I don't believe those are common areas.

21 Q    Did at any time did Mr. Carey inform you that he needed

22 to get back to Glacier Point to get to his car or anything

23 like that?

24 A    No, he did not.

25 Q    And then if I could just show Exhibit 5 one more time.

30

1  A    And may I -- may I follow up on that question with a

2  statement?

3          MR. GRANTHAM:  Your Honor, I would just have him

4  respond to questions at this point.

5          THE COURT:  If you've responded -- if there's more

6  to your response that is responsive to the question.

7  Otherwise you need to wait for a question.

8          THE WITNESS:  The individual's car was -- he

9  indicated to me where his car was, and it was not at Glacier

10 Point.

11 BY MR. PRICE:

12 Q    So let me ask a question.  How did -- did Mr. Carey

13 identify to you where his car was?

14 A    Yes, he did.

15 Q    And where was it?

16 A    Adjacent to Stillman Meadow.

17 Q    Okay.  And where is Stillman Meadow compared to

18 Housekeeping where we're describing?

19 A    It's just east of Housekeeping camp.

20 Q    Okay.  And then I just want to refresh.  You -- you

21 identified this before as a wing suit, Exhibit 5.  Is this

22 the type of equipment that you had noticed rock climbers

23 climbing in?

24 A    No.  I've never seen a rock climber climbing in

25 equipment like that.

31

1          MR. PRICE:  Okay.  No further questions.

2          MR. GRANTHAM:  One second.

3          THE COURT:  Sure.

4      (Pause.)

5          MR. GRANTHAM:  I have nothing further, your Honor.

6          THE COURT:  All right.  I have a question or two.

7          THE WITNESS:  Yes, your Honor.

8          THE COURT:  Just to clarify.  Oh, back on Stillman

9  Meadow, just so we're clear on the record, it's north of

10 Housekeeping.  Would that put -- excuse me.  It's east of

11 Housekeeping.  Would that put it north of Curry Village or

12 commonly referred to as Half Dome Village?

13         THE WITNESS:  Yes, your Honor.

14         THE COURT:  All right.  And -- okay.  And at what

15 height was the individual in the parachute when you first

16 arrived approximately, if you can approximate?

17         THE WITNESS:  We estimated on scene approximately

18 130 to 150 feet, your Honor.

19         THE COURT:  All right.  And then tree climbers

20 went up the tree to rescue him?

21         THE WITNESS:  Yes, your Honor.  During the time we

22 were on scene the individual had climbed down the tree quite

23 a considerable amount, and the tree climbers when they

24 arrived went up the rest of the way and lowered him from

25 that point.

1          THE COURT:  All right.  How did the tree climbers

2 get up?

3          THE WITNESS:  They used a system I hadn't seen

4 before, your Honor.  It was sort of like a slingshot that

5 they shot a rope over a lower branch and then pulled that

6 rope over and I believe pulled a heavier weight rope up, and

7 it's not a system I'm familiar with, your Honor, but --

8          THE COURT:  Okay.

9          THE WITNESS:  -- they used some sort of slingshot

10 to shoot a rope into the tree.

11          THE COURT:  Ultimately they got a rope up there,

12 pulled themselves up?

13          THE WITNESS:  Correct, your Honor.

14          THE COURT:  And did they then attach themselves to

15 the person they found in the tree or tell me how that

16 worked?

17          THE WITNESS:  That was my understanding, your

18 Honor, but I didn't have a good -- I wasn't able to see

19 completely clearly how they were doing it, but it appeared

20 that the tree climber put the rope into the tree, pulled

21 himself up into the tree, and then secured himself to the

22 tree and secured the rope and/or himself to the other

23 individual in the tree and then lowered that individual

24 down.

25          THE COURT:  All right.  Did the two of them come

33

1 down as one?

2          THE WITNESS:  No, your Honor.

3          THE COURT:  Okay.

4          THE WITNESS:  He just lowered the -- the

5 individual in the tree down, and then he came down

6 separately.

7          THE COURT:  All right.  And that individual that

8 was lowered down by the tree climbers was the Defendant that

9 you've previously identified?

10         THE WITNESS:  Yes, your Honor.

11         THE COURT:  All right.  Very well.  Thank you.

12         Any followup on that from the Government?

13         MR. PRICE:  Your Honor, I was just going to let

14 you know that our next witness is the tree climber.

15         THE COURT:  Okay.  All right.  Anything from the

16 Defense on that?

17         MR. GRANTHAM:  No, your Honor.

18         THE COURT:  May this witness be excused?

19         MR. PRICE:  Yes, your Honor.

20         MR. GRANTHAM:  Yes, your Honor.

21         THE COURT:  All right.  Do you anticipate he be

22 called again?  If not, he can, of course, remain in the

23 courtroom.

24         MR. PRICE:  We don't anticipate.

25         THE COURT:  All right.  Thank you very much, sir.

34

1          THE WITNESS:  Thank you, your Honor.

2          THE COURT:  You may step down.  You can leave the

3 -- the book.  You might give that document back to defense

4 counsel.  It was not moved into evidence.

5          Very well.  Does the Government have -- well, I

6 know you do.  Do you have another witness?

7          MR. PRICE:  Yes, your Honor.  The Government would

8 call Justin Buzzard.

9          THE COURT:  Step forward, sir.  I believe you're

10 going to be the next witness.  If you'll step up and stand

11 next to this box, we will have you sworn in.

12          JUSTIN BUZZARD - PLAINTIFF'S WITNESS - SWORN

13          THE COURT:  Please take a seat.  You need to get

14 you a comfortable position within hopefully six inches of

15 that microphone without you having to lean forward

16 uncomfortably and without you having to bob and weave.  If

17 you need water or anything, let me know.  All right.

18          And did you state -- let's have you state your

19 full name for the record and spell your last name.

20          THE WITNESS:  Justin Lee Buzzard, and the last

21 name is B-U-Z-Z-A-R-D.

22          THE COURT:  Thank you very much.  You may proceed.

23                    DIRECT EXAMINATION

24 BY MR. PRICE:

25 Q    Good morning, Mr. Buzzard.  Can you state where you are

35

1 currently employed?

2 A    With the NPS Park Service, Valley Forestry.

3 Q    And what's your -- what's your job there?

4 A    Tree worker.

5 Q    And how long have you been working there?

6 A    I've been with Yosemite a year.

7 Q    And how long have you been in the general occupation?

8 A    Since 2007.

9 Q    And what kind of -- what kind of work do you do as a

10 tree worker?

11 A    Here it's mainly removing hazardous trees, whether it

12 be falling them or climbing them to remove them in smaller

13 pieces.

14 Q    And do you often have to climb trees to accomplish this

15 job?

16 A    Yes.

17 Q    What kind of training have you received?

18 A    I have informal on-the-job training throughout the

19 several companies that I've worked for.  I've had formal

20 training from International Society of Arboriculture and --

21 and just mentors.

22 Q    And do you recall the events of September 6th, 2016?

23 A    Yes.

24 Q    How did that morning start for you?

25 A    The morning started, I was in the El Portel Forestry

36

1 shop getting ready for the day's work.  We were going to be

2 on -- working on 140, and my foreman informed me that a

3 fellow was stuck in a tree in Housekeeping Camp and that I

4 needed to retrieve him out of the tree.  And so Scott, my

5 foreman, and I went to Housekeeping and sized up the tree

6 and the situation.

7 Q    Can you describe the tree in question?

8 A    Yeah.  It was a larger tree, probably 160 to 170 feet

9 tall, probably around 40, 58 inch diameter.  The fellow as

10 60, 70 feet high.  First branches were probably around 50

11 feet, and that's the tree, parachute at the top of it.

12 Q    And so you described the width in inches, but so could

13 you put your arm around this tree?

14 A    No.  Not even where the fellow was.

15          MR. PRICE:  Okay.  And I'd like to show the

16 Defendant (sic) what has been introduced as Exhibit 6 again.

17          THE COURT:  Sure.

18 BY MR. PRICE:

19 Q    Mr. Buzzard, does this -- is this the tree that you

20 recall?

21 A    Yeah.  Yes.

22 Q    And is it climbable without special equipment?

23 A    No.

24 Q    And why not?

25 A    Because the bark is just so exfoliating it just peels

37

1 off.  It's no good jugs or anything to grab onto.

2          THE COURT:  No good what?

3          THE WITNESS:  Like hand -- hand holds.

4 BY MR. PRICE:

5 Q    So how did -- how did you climb it then?

6 A    I climbed it with tree climbing gear.  So I had foot

7 ascenders, a knee ascender, a saddle, a friction hitch on my

8 climb line.  I had a climb line that went up and over a

9 branch.

10 Q   Was it -- so not everyone in this court is going to be

11 very familiar with all these items.  So can I show you

12 Exhibit 8, which is in the binder in front of you.  If you

13 flip to the picture.  And do you recognize this picture?

14 A   Yes.

15 Q   What is it?

16 A   It's a picture of me ascending -- looks like beginning

17 to ascend the tree.

18 Q   And so now can you identify in the picture what kind of

19 equipment you used to climb the tree?

20 A   Yeah.  So --

21          THE COURT:  Maybe just have -- if I may, maybe

22 just have the witness describe the steps, the procedures he

23 followed in getting himself where he was up the tree.

24          MR. PRICE:  Okay.

25          THE COURT:  In your own words.

38

1          THE WITNESS:  Yeah.  So I arrived at the scene.
2 I've done this enough to know kind of what I needed to do.
3 So it didn't take long to formulate a plan.  The plan was to
4 get a throw line up and over a branch above the person in
5 the tree.  So I did that.  I got a -- it's a small piece of
6 nylon, basically a light rope with a weight on the end.  I
7 used a slingshot to get it up high enough and -- and then
8 pulled my climb line through.  Once the weight's on the
9 ground on the other side, I attached my climb line to it and
10 pulled my climb line up and over the bridge.  And then one
11 end I anchored to the tree, and then the tail is where I
12 attached my friction hitch, which is basically an eight
13 millimeter PI and I, about 26 inches long that wraps around
14 the rope and when you put weight on it creates friction
15 which does not allow you to -- to descend.
16 BY MR. PRICE:
17 Q    And so this equipment allowed you to climb up to where
18 the person stuck in the tree was?
19 A    Yes.
20 Q    And once you climbed to that point, you came face to
21 face with that person.  Is that person in the courtroom
22 today?
23 A    Yes.
24 Q    Can you identify him?
25 A    Yes.  He's right here.

39

1 Q    Can you identify him again for the judge?

2 A    Right here.

3           THE COURT:  You identified the Defendant?

4           THE WITNESS:  Yes.

5           THE COURT:  All right.  Thank you.

6 BY MR. PRICE:

7 Q    Once you reached in, what was your interaction with

8 him?

9 A    I got to him.  I asked just kind of "Man, having a bad

10 day?"  And he said, "No, not really, just" --

11           MR. GRANTHAM:  Objection, your Honor.  Simply we

12 have not been provided with any statements that Mr. Carey

13 may or may not have made to Mr. Buzzard.  I'm not familiar

14 with any statements that were made, and under Rule

15 16(a)(1)(A), such statements as having been requested have

16 not been provided.  So I'd move to exclude that.

17           THE COURT:  I would be inclined to so exclude.

18           MR. PRICE:  Withdrawn.

19 BY MR. PRICE:

20 Q    So outside of communication, what was -- what did you

21 do with Mr. Carey once you reached him?

22 A    Yeah.  So on my way up I took an anchor point for him.

23 I took another climb line and another friction device up

24 with me as I ascended the tree, and I used what's called a

25 U-Saver, which is basically a friction saver that goes

40

1 around the trunk of the tree that his climb line would go

2 through, and it had a petzl zigzag on there, on the line.

3 So I installed the friction saver, installed the climb line,

4 and yeah, hooked it up to Austin.

5 Q    And so, not using any statements he made for the truth

6 of the statement but for what effect it had on you, did he

7 tell you anything about the harness that allowed you to

8 attach it?

9 A    Yes, he did.  I -- I asked if -- the only spot I could

10 see was on his chest, and I asked specifically if it was

11 rated to hold his body weight, which he agreed it was.

12          THE COURT:  I'm sorry.  The last words you said?

13          THE WITNESS:  He agreed that it was.

14          THE COURT:  Okay.

15 BY MR. PRICE:

16 Q    I'm now going to show you what has been introduced as

17 Exhibit 2.  Mr Buzzard, is this the same harness you're

18 talking about?

19 A    Yes.

20 Q    And is this the kind of harness you're familiar with

21 for climbing trees?

22 A    No.

23 Q    Can you identify any differences?

24 A    The differences are -- I mean, I've never seen a

25 parachute harness before or that type of harness.  A

41

1 climbing harness is -- usually the tie in point is at your

2 waist because you're kind of like sitting back on a climbing

3 harness.

4          THE COURT:  To climb a tree?

5          THE WITNESS:  To climb a tree.  This situation,

6 the difference was I feel like you're -- you're meant to be

7 hanging.  So all the anchor points are up here.

8 BY MR. PRICE:

9 Q    Do you have knowledge about rock climbing harnesses

10 too?

11 A    No.

12 Q    Okay.  Were you able to -- to lower him by the harness?

13 A    Yes.

14 Q    Did you see any sign of any tree climbing equipment on

15 this person or in the tree around him?

16 A    No, I did not.

17 Q    Do you believe it's possible that Mr. Carey could have

18 climbed that tree with the equipment he had on his person?

19 A    No.

20          MR. PRICE:  Thank you.  That's all I have.

21          THE COURT:  All right.  Cross examination?

22          MR. GRANTHAM:  Just a couple of questions.

23                    CROSS EXAMINATION

24 BY MR. GRANTHAM:

25 Q    Mr. Buzzard, you mentioned -- and I believe Government

42

1  Exhibit 8 depicts this.  You used what you called an

2  ascender to go up the tree, is that accurate?  Can you

3  describe how the ascender works?

4  A    I had two on.  So I have a knee ascender which attaches

5  -- they call it a knee ascender, but really it's an extended

6  foot ascender.  It's a loop that goes around my foot, and

7  it's got a thicker, stiffer piece of rope about a foot long

8  with a bungee on it that hooks up to my climbing system.  So

9  when I extend my leg, it -- that cam catches.  It doesn't go

10  down.  So I can move upward, and as I lift my leg, the

11  bungee brings the ascender up with me.

12  Q    So it's -- it's kind of like going up a ladder?

13  A    Exactly.

14  Q    But it's like a fabric system?

15  A    The technique's called rope walking.  So on the other

16  foot I have just a regular foot ascender, and so it's just a

17  matter of walking up the rope.

18  Q    Got it.

19  A    And the climbing system is moving up with me.

20  Q    Got it.  Are such ascenders used, to your knowledge, in

21  various types of rock climbing?

22  A    I couldn't give you an honest answer.  I don't know.

23  Q    Do you rock climb yourself?

24  A    No, I do not.

25  Q    So you don't have any familiarity with rock climbing

43

1 procedures or anything like that?

2 A    No.

3 Q    Have you ever seen them being used, so maybe in a

4 video, something like that, say climbing up some structure

5 in Yosemite?

6 A    I have but not this particular -- I've never seen this

7 particular system used in a rock climbing setup.  I've

8 always seen hand ascenders, one-legged jugging, and that's

9 all.

10              MR. GRANTHAM:  Okay.  That's it, your Honor.

11              THE COURT:  All right.  Redirect?

12              MR. PRICE:  No, your Honor.

13              THE COURT:  All right.  Just in the interest of

14 full disclosure, there were several forestry individuals

15 removing trees around the courthouse the other day, within

16 the last week.  I spent probably 30 minutes watching someone

17 up in the tree cut off segments of it above that person.

18 Was that you?

19              THE WITNESS:  Yes.

20              THE COURT:  That was you up in the tree?

21              THE WITNESS:  It's a cedar out back here?

22              THE COURT:  Yes.

23              THE WITNESS:  We lowered pieces?

24              THE COURT:  Yes.

25              THE WITNESS:  Yes.

44

1          THE COURT:  So I have some extrajudicial
2  information about how that portion is done, but I don't see
3  how it impacts anything that we've discussed here today.  It
4  was very impressive.  All right.  Thank you.
5          THE WITNESS:  Thank you.
6          THE COURT:  You may be excused, sir.  You're free
7  to go.
8          Is the witness free to go?
9          MR. PRICE:  Yes, your Honor.
10          MR. GRANTHAM:  Nothing from the Defense, your
11  Honor.
12          THE COURT:  All right.  Very well.  Thank you very
13  much.
14          MR. PRICE:  Your Honor, the Government would rest
15  at this time.
16          THE COURT:  All right.  Very well.  Does the
17  Defense intend to call any witnesses?  I'm probably going to
18  take a break at this point.  I just want to get a feel for
19  what we have next.
20          MR. GRANTHAM:  The Defense does not plan on
21  calling any witnesses and would also request a brief break
22  before we proceed.
23          THE COURT:  I didn't hear the last --
24          MR. GRANTHAM:  The Defense is not calling any
25  witnesses and would also request just a -- a brief break

*Echo Reporting, Inc.*

45

1  before we proceed.

2          THE COURT:  All right.  Very well.  Let's take --
3  it's precisely 10:01 almost.  Let's take a 15-minute break.
4  We'll come back at 10:15, and we'll argue the case.

5          MR. PRICE:  Thank you, your Honor.

6          MR. GRANTHAM:  Thank you, your Honor.

7      (Proceedings recessed briefly.)

8          THE COURT:  All right.  It is 10:17.  We are
9  resuming the trial in the case of U.S. versus Carey.
10 Defense counsel is not present.  We will all wait for
11 defense counsel.

12     (Pause.)

13         THE COURT:  Okay.  It is 10:17.  Defense counsel
14 and Defendant have entered.  The Government had closed.  I
15 think the Defense had indicated it had no witnesses or
16 evidence to introduce?

17         MR. GRANTHAM:  That's correct, your Honor.

18         THE COURT:  All right.  I want to anticipate some
19 issues, and it may impact what we do next ow how we do it.

20         MR. GRANTHAM:  Your Honor, just we would be moving
21 at this time for a Rule 29 motion.

22         THE COURT:  All right.  Let me address that.  The
23 motion will be denied.  I find that viewing the evidence in
24 the light most favorable to the Government, it cannot be
25 said that there is no possibility the Government could not

46

1   carry its burden.  We do have evidence before us that the

2   Defendant was in a tree at a height not obtainable without

3   special equipment, which he did not have unless it was

4   obtained by air.  In other words, it seems clear from the

5   evidence beyond a reasonable doubt that the Defendant had

6   landed in the tree either by parachute or other means, maybe

7   a -- what do they call it, a squirrel suit?  What do they

8   call it?

9           MR. PRICE:  Wing suit, your Honor.

10          THE COURT:  Wing suit.  Thank you very much.  So

11  that he did -- certainly the evidence beyond a reasonable

12  doubt being unrefuted is that the Defendant did arrive in

13  the tree by air.  He was wearing equipment consistent with

14  delivery by air, a parachute, a harness, a wing suit,

15  equipment which at least I think it can be concluded from

16  the evidence presented would have no other purpose other

17  than for a delivery from the air to the ground.  Certainly

18  the evidence before me, the unrefuted evidence before me is

19  that this did create a hazard, the hazard of the Defendant

20  to himself, injuring himself, of himself falling out of the

21  tree, and maybe being injured and having to be cared for by

22  others.  It created a hazard of him falling from the tree

23  and hitting another individual, falling through the roof of

24  one of the cabins and landing on someone with, I would

25  anticipate, the likelihood of substantial injury from the

1  height that he was first observed, which was approximately

2  140 feet I think the evidence shows.  He created a hazard by

3  allowing equipment to fall.  It did fall.  And he created a

4  hazard to the folks that had to come rescue him.  So I do

5  find that there is evidence beyond a reasonable doubt that

6  the Defendant did cause himself to be delivered by air and

7  that he did create a hazard.

8          And I have to say the evidence does explain why it

9  ips a hazardous activity.  It's not as sometimes argued a

10  victimless crime.

11          Now, it seems to me that where we're headed --

12  maybe I'm anticipating an issue -- is there was at least a

13  suggestion from the questioning -- and I'm jumping ahead and

14  anticipating the defense arguments -- that perhaps the

15  Defendant -- that there is an absence of evidence that the

16  Defendant was base jumping, that he might have been carrying

17  all this equipment simply as a safeguard in case he fell

18  while engaging in perfectly legal activity such as rock

19  climbing.

20          Now, it seems to me that the issue that that

21  raises, it certainly doesn't foreclose a finding that if

22  that's what the Court were to conclude or at least the

23  evidence would keep the Court from finding that he did, in

24  fact, engage in base jumping, an intentional act.  Then the

25  question becomes is this a crime that requires a specific

48

1 intent.  So, as I say, I'm anticipating a lot.  I may be

2 totally off base here.  I may have just given you some ideas

3 you hadn't thought of, but I doubt that.  So that's one

4 issue.

5         Now, it also occurs to me that we -- we lack and

6 we may need evidence in that regard if that is going to be

7 the claim, because the Court can't ignore -- it would not

8 base a finding on it.  It would not take judicial notice of

9 this to the point it would justify a finding of guilt, but

10 the Court's knowledge of the world, of the world of Yosemite

11 of climbers would indicate that it would probably -- or

12 certainly be so rare for someone to climb with all of the

13 equipment that the Defendant wore that I would be inclined

14 to seek expert testimony.

15        If that is going to be the approach that's taken,

16 that this was not an intentional act, that the Defense will

17 argue that there is no evidence that he was base jumping, I

18 think if an expert were to come in and testify and say some

19 climbers do carry all that gear without any intent

20 whatsoever to jump, that would be one thing.  If they came

21 in and said never in the history of climbing has anyone

22 climbed -- that we, to our knowledge, with all of that gear

23 except where they intended to jump from at some point where

24 they were climbing.

25        So, I'm sorry.  Those are my random thoughts.  I

49

1 may be totally off base.  They may have no relevancy

2 whatsoever to any argument or any issue in this case, but I

3 wanted to share them with you before you argued and asked

4 whether or not we might not need additional evidence on the

5 issue of that last issue just raised.

6           Any thoughts from either side?  The Government

7 first.  It's your burden.

8           MR. PRICE:  One moment, please, your Honor.

9           THE COURT:  All right.

10           MR. GRANTHAM:  It is the Government's -- it may be

11 helpful for me to address.  It may head off them having

12 to --

13           THE COURT:  All right.

14           MR. GRANTHAM:  It's not my intention to -- to --

15 to necessarily make that argument.

16           THE COURT:  Okay.

17           MR. GRANTHAM:  I do have some arguments I wish to

18 make.

19           THE COURT:  All right.

20           MR. GRANTHAM:  I don't see the necessity of

21 continuing this further to call in an expert on that issue.

22           THE COURT:  All right.  We will --

23           MR. GRANTHAM:  And certainly -- I'm sorry.

24           THE COURT:  Go ahead.

25           MR. GRANTHAM:  Certainly it's within -- obviously,

50

1 you know, we have an opportunity to present evidence that we

2 would want to present, and we have done what we have wanted

3 to do in this case.

4          THE COURT:  All right.  With that in mind, is

5 there anything that the Government wishes to do?

6          MR. PRICE:  No, your Honor.

7          THE COURT:  All right.  Very well.  It is now the

8 opportunity for the Government to argue its case.

9          MR. GRANTHAM:  Just to clarify --

10          THE COURT:  Sure.

11          MR. GRANTHAM:  -- I made a Rule 29 motion.  I

12 wasn't -- it was denied.  It's --

13          THE COURT:  It was denied.

14          MR. GRANTHAM:  Yes.  I didn't have an opportunity

15 necessarily to argue on that.  It's going to be essentially

16 the same as what I would argue in closing.

17          THE COURT:  All right.  Well, then let me withdraw

18 the denial of the Rule 29 motion.  I will reserve judgment

19 on it until after the argument.

20          MR. GRANTHAM:  That works, your Honor.

21          THE COURT:  All right.

22          MR. GRANTHAM:  Thank you.

23          THE COURT:  You see the obstacles you have to

24 overcome.  So perhaps that is of more benefit than harm to

25 you.

51

1          MR. GRANTHAM:  Yes, your Honor.

2          THE COURT:  You may proceed.

3      CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

4          MR. PRICE:  Good morning, your Honor.  Thank you.

5          So as -- as just discussed, I mean, the Defense

6  has insinuated that there's some potential the Defendant was

7  perhaps rock climbing and jumped from there.  They've

8  provided no evidence, and they have chosen not to provide

9  more evidence along those lines, and given the gear that we

10 have entered into evidence and the -- how cumbersome it is,

11 how heavy it is, you know, it's next to impossible in our

12 minds that this is what happened.

13          In addition, Glacier Point and Taft Point are not

14 common rock climbing places, and one of our witnesses, Mr.

15 Buzzard, who identified that the harness was not the type

16 typically used for climbing.

17          In summary of the case, Ranger Conlow identified

18 that this all occurred in Yosemite.  He -- both him and Mr.

19 Buzzard identified that there was a parachute in the tree,

20 that Carey was in a harness, that there was a base jumping

21 harness, that there was no other way to be in that tree, and

22 that you couldn't climb it without specialty gear, which he

23 did not possess.

24          As the Court identified briefly, it's -- there is

25 clear -- it's clear in this case why base jumping creates a

52

1 hazardous condition and especially so for the fact that the

2 rescue had to be effectuated up the tree.  That gear was

3 falling over inhabited areas, that there was the risk of not

4 getting stuck in the tree and just falling in the inhabited

5 areas to begin with.

6         So, in summary, I think that the Government has

7 proven that he was -- that Mr. Carey was delivered by

8 parachute, his own person delivered to the valley floor from

9 above, and that he consciously disregarded the risks that

10 this act entailed, including creating a hazardous condition,

11 both because of his lack of control over his landing and

12 because of the likelihood that he would end up in a

13 situation like he did, where gear would be falling and there

14 would be a risky recovery.

15         As the Ninth Circuit made clear in <u>Alvarez</u>, you

16 know, base jumping, just like in this case, was a clear

17 violation of both Title 36, Code of Federal Regulations

18 2.34(a)(4) and 2.17(a)(3), and I would ask the Court to find

19 him guilty of both counts.

20         THE COURT:  All right.  Thank you very much.

21         Defense argument?

22       CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

23       MR. GRANTHAM:  Thank you, your Honor.

24         Your Honor, as the Court is aware and appears to

25 already -- well, the Court has heard all of the evidence in

53

1 this case.  The Government has a burden, however, to prove

2 the elements of the offense beyond a reasonable doubt.  The

3 elements of the offense, as laid out in the Government's own

4 trial brief, are -- and I'm referring here specifically to

5 Count 1, that the Defendant delivered a person or object by

6 parachute, helicopter, or other airborne means, without

7 emergency involving public safety or serious property loss

8 and not pursuant to the terms and conditions of a permit.

9         There has been no evidence presented that there

10 was not a jump -- valid jump related to a permit or that it

11 was not a jump related to an emergency.  That -- we have

12 dearth.  We have no evidence on that point.  I would direct

13 the Court to a District Court case out of Utah, United

14 States v. Ox.  It's at 56 F.Supp.2d 1214.  It's a 1999 case

15 in which the District Court found that failure to prove an

16 essential element of the case, here specifically that the

17 jump did not occur pursuant to a permit was -- was --

18 destroyed the Government's argument.

19         I -- the Court goes on at length citing several

20 different cases that discuss the fact that whether or not

21 someone jumps pursuant to a permit is relevant and is an

22 essential element of the case that the Government has to

23 prove.  Likewise, they would need to prove based on a

24 similar logic, that he did not jump pursuant to some kind of

25 emergency involving public safety or serious property loss.

54

1 That is -- in this case, again, we have no evidence on
2 either of those points, and it is the Government's burden to
3 prove all of these points beyond a reasonable doubt.

4        In addition, as the Court has already noted, the
5 Government's case is based entirely on circumstantial
6 evidence in that he was found in a tree.  Essentially that's
7 what they've proven.  There was a parachute in the tree.
8 There's no evidence he was connected to that parachute.  He
9 did have a wing suit on.

10        We have no witnesses who saw him fly through the
11 air or at any point.  We have no witnesses who saw him jump.
12 We have basically testimony that they rescued a man from a
13 tree, and there are circumstances that would lead one to
14 believe -- but it's simply to note that the -- the case is
15 entirely based on circumstantial evidence.

16        The Court in United States v. Ox, stated that:
17              "Under our Constitution, the Fifth
18              Amendment requires and all parties here
19              would acknowledge that the United States
20              bears the burden of proving beyond a
21              reasonable doubt that the Defendant is
22              guilty of all of the elements of a
23              crime."
24        Citing to the Fifth Amendment in In Re Windship, a
25 United States Supreme Court case from 1970.

55

1           In U.S. v. Ox, the Court said:

2               "Thus, as its findings and analysis

3           made clear, the Carroll court understood

4           that" --

5           Carroll is a District Court case out of Missouri

6   from 1993.

7           -- "court understood that in order to

8           find the Defendant guilty under Section

9           2.17(a)(3), the United States was

10          required to establish beyond a

11          reasonable doubt that the Defendant did

12          not have a permit to deliver himself by

13          parachute."

14          Later in United States v. Ox, it says:

15              "Thus, it appears that the lack of

16          a permit is a necessary element of

17          Section 2.17(a)(3) offense.  Therefore,

18          the Court finds that the absence of a

19          permit to be an element of a 36 C.F.R.

20          2.17(a)(3) offense."

21          Simply propose that the Government has not met

22   their burden of satisfying all the elements of this offense,

23   your Honor.

24          THE COURT:  What about Count 2?

25          MR. GRANTHAM:  Thank you, your Honor.  If I may

*Echo Reporting, Inc.*

56

1 just address that as well.  I do have something on that.

2          In terms of Count 2, the disorderly conduct

3 charge, I would direct your Honor, as the Government has

4 repeatedly cited to this case, U.S. v. Alvarez, which is a

5 Ninth Circuit case where an individual was found guilty of

6 disorderly conduct under this particular subsection as a

7 result of a base jump.  What I want to point to, if you look

8 at the statute in 2.34, it states:

9                    "A person commits disorderly

10               conduct when with intent to cause public

11               alarm, nuisance, jeopardy or violence"

12               -- so there's either a specific intent

13               to do that -- "or knowingly or

14               recklessly creates a risk thereof."

15          So either you do it intentionally or you do it

16 knowingly and recklessly -- commits any of the following

17 acts.  And here we have create or maintain a hazardous or

18 physically offensive condition.

19          In U.S. v. Alvarez, the Court goes to great

20 lengths to define what recklessly means, and it cites the

21 model Penal Code's definition of recklessly, and I don't

22 know if we have the specific citation to U.S. v. Alvarez,

23 but it's 226 F.3d 989, a 2000 case.

24          Under the model Penal Code, recklessly is defined

25 -- a person acts recklessly with respect to a material

57

1  element of an -- and this is all in U.S. v. Alvarez as well

2  -- with respect to a material element of an offense when he

3  consciously disregards a substantial and unjustifiable risk

4  that the material element exists or will result from his

5  conduct.

6          U.S. v. Alvarez goes on to say:

7              "The Supreme Court has, moreover,

8              explained that the criminal law

9              generally permits a finding of

10             recklessness only when persons disregard

11             a risk of harm of which they are aware."

12         It goes on to say, the Court in Alvarez:

13             "We thus conclude that the relevant

14             inquiry in finding recklessness here is

15             whether the Defendants deliberately

16             disregarded a substantial and

17             unjustifiable risk of creating a

18             hazardous or physically offensive

19             condition of which they were aware."

20         The argument here, your Honor, is simply Mr. Carey

21 is someone who has participated in base jumping legally in

22 various parts around the world.  He's an experienced base

23 jumper.  He was not aware of this possibility.  He has never

24 been stuck in a tree before in his many jumps, and that's --

25 it's not his -- it wouldn't be his understanding that this

58

1 was a likely outcome based on his experience.

2          In addition, if the Court -- if he was jumping

3 pursuant to a permit or pursuant to an emergency, then I

4 think we're in a situation where I don't know how he can be

5 found guilty of the disorderly conduct if he jumped pursuant

6 to a permit or jumped pursuant to an emergency.

7          And, with that, I would submit.

8          THE COURT:  Government wish to comment, final

9 word?

10          MR. PRICE:  Yes, your Honor.  May I have one

11 moment?

12          THE COURT:  Sure.

13     (Pause.)

14          CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

15          MR. PRICE:  Your Honor, thank you.  Just briefly.

16          Your Honor, I believe that the Court can take

17 judicial notice of past cases that they have had regarding

18 base jumping in this district in Yosemite where it has been

19 clear that Yosemite does not permit base jumping at all.  So

20 I think that that can address the question of a permit.

21          Additionally, I'd like to point out the

22 intentionality with which a base jumping harness that we

23 introduced in evidence had to have been put on and the --

24 the knowingness that has to go into putting that on and that

25 the -- the risk that's being disregarded intentionally there

59

1 is a common objective risk that base jumping is not a safe

2 activity, and I think that it -- it is pretty clearly shown

3 based on our evidence that it is not.

4          And, lastly, I'd point out that the 10th Circuit

5 ultimately reversed the District Court in U.S. v. Ox and

6 found that -- found that the Defendants were guilty of base

7 jumping.

8          THE COURT:  Anything else?

9          MR. PRICE:  No, your Honor.

10          THE COURT:  Well, I will give defense counsel an

11 opportunity to comment on that last --

12          MR. GRANTHAM:  Yes, your Honor.

13          THE COURT:  -- statement that Ox was reversed.

14          MR. GRANTHAM:  Your Honor, what happened in U.S.

15 v. Ox was it was a District Court case in 1997.  That case

16 found that the regulation at issue today was vague and

17 ambiguous, and they struck down the conviction.  The 10th

18 Circuit reversed, sent it back to the District Court.

19 District Court had another trial.  The District Court in the

20 subsequent case, the 1999 case, found that the Government

21 had the burden to prove beyond a reasonable doubt that the

22 person didn't jump pursuant to a permit.  So the District

23 Court case that I am citing is subsequent to the 10th

24 Circuit's opinion, and that case was never appealed to my

25 knowledge.

60

1          THE COURT:  All right.  Well, I think prudence

2   dictates that I take some time and look at it.

3          I would like the Defense to comment on the

4   propriety of taking judicial notice of -- as the Government

5   asked, that base jumping is not permitted in the park.

6          MR. GRANTHAM:  Yes, your Honor.  I'd be happy to

7   address that.

8          I believe the Government's trial brief discussed

9   judicial notice, and specifically Rules 201 of the Federal

10  Rules of Evidence, which states that the Court may take

11  judicial notice of any undisputed facts which are either

12  generally known within the territorial jurisdiction or

13  capable of accurate and ready determination.

14          Certainly the Court having -- being, you know, a

15  resident of the Valley and familiar with the Valley may have

16  some understanding about base jumping generally.  That said,

17  there are -- you know, even yesterday I was looking up all

18  the different kinds of permits that one can get in Yosemite.

19  There are a lot of different kinds of permits that one can

20  achieve or one can obtain, and one of them happens to be a

21  hang gliding permit.  There are other permits that people

22  can obtain that involve aerial transportation.

23          I think we have -- I don't think it's proper for

24  the Court to take judicial notice.  I think that requires

25  some sort of evidence to be produced and introduced by the

1 Government on that particular point, and that would -- that

2 would be the position, your Honor.

3         THE COURT:  Well, and that's the -- that's the

4 interpretation you give to Ox?

5         MR. GRANTHAM:  Yes.  And I would also say that

6 even if the Court were to take judicial notice of the permit

7 issue, there still is the issue of whether or not there was

8 an emergency, and we have no evidence that -- no evidence

9 put forward by the Government that there was no emergency

10 going on at the time that could have been led to the conduct

11 in this case.

12         THE COURT:  Well, let me just comment briefly.

13 You did argue earlier too that this case turns on

14 circumstantial evidence.  I will say that it presents about

15 a strong a case of circumstantial evidence as I've ever seen

16 or even imagined in the law when you find an individual 150

17 feet up in a tree with a parachute and a wing suit and a

18 harness for all of those things.  It's about as strong as it

19 gets.

20         The -- I believe the Court could find from the

21 obvious preparation that was going into this -- that went

22 into this delivery by air -- well, I'm going to hold back on

23 that.  It would certainly suggest it was with aforethought

24 and planning, which was somewhat inconsistent with an

25 emergency but does not necessarily rule out an emergency.

62

1  Interesting.

2          MR. GRANTHAM:  Yes, your Honor.

3          THE COURT:  All right.  I will have to consider

4  these things.  Do the parties wish -- think it would be

5  productive to submit any further briefs or if you've argued

6  -- it seems to me you have, but I'll give you that

7  opportunity if you want to, either side?

8          MR. GRANTHAM:  I think I've cited the main case.

9          THE COURT:  All right.

10         MR. GRANTHAM:  I did research extensively the

11 statute.  This appears to be -- there are several cases

12 interpreting the statute.  This case is just the one that

13 goes into relatively great detail about this element issue.

14         THE COURT:  All right.

15         MR. PRICE:  And, your Honor, I think that the case

16 I cited, U.S. v. Alvarez, which is in circuit, is the

17 relevant case.  I don't think we need to write a brief on

18 that.

19         THE COURT:  All right.  Very well.  Is it

20 submitted?

21         MR. GRANTHAM:  Submitted, your Honor.

22         THE COURT:  Let me --

23         MR. PRICE:  Submitted, your Honor.

24         THE COURT:  All right.  Let me -- let me review my

25 notes.  Let me review the cases, and I'll try to get you a

63

1 brief written decision as soon as I can.  Thank you all.

2          MR. PRICE:  Thank you, your Honor.

3          MR. GRANTHAM:  Thank you, your Honor.

4      (Proceedings concluded.)

5

6          I certify that the foregoing is a correct

7 transcript from the electronic sound recording of the

8 proceedings in the above-entitled matter.

9

10 /s/Crystal Thomas              11/20/2017
   Transcriber, AAERT CERT *65    Date

11
   FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
12

13
   /s/L.L. Francisco
14 L.L. Francisco, President
   Echo Reporting, Inc.
15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*