1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF CALIFORNIA

3                              --oOo--

4  UNITED STATES OF AMERICA,      ) Case No. 16MJ00088-MJS
                                  )
5            Plaintiff,           ) Fresno, California
                                  )
6       vs.                       ) Thursday,
                                  ) October 19, 2017
7  AUSTIN LEE CAREY,              ) 11:00 a.m.
                                  )
8            Defendant.           )
   _____)

9

10                     TRANSCRIPT OF SENTENCING
              BEFORE THE HONORABLE MICHAEL J. SENG
11                 UNITED STATES MAGISTRATE JUDGE

12
   APPEARANCES:
13
   For the Plaintiff:          JOHN PRICE, ESQ.
14                             National Park Service
                               Law Enforcement Office
15                             Post Office Box 517
                               Yosemite, California 95389
16                             (209) 372-0243

17 For the Defendant:          REED B. GRANTHAM, ESQ.
                               Office of the Federal Defender
18                             2300 Tulare Street
                               Suite 330
19                             Fresno, California 93721
                               (559) 487-5561
20
   Transcriber:                Crystal Thomas
21                             Echo Reporting, Inc.
                               4455 Morena Boulevard
22                             Suite 104
                               San Diego, CA 92117
23                             (858) 453-7590

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

1

1    FRESNO, CALIFORNIA THURSDAY, OCTOBER 19, 2017 11:00 A.M.

2                              --oOo--

3        (Call to order of the Court.)

4            THE CLERK:  Court calls case number 16MJ88, United

5    States versus Austin Lee Carey.

6            MS. ST. VINCENT:  Good morning, your Honor.  Susan

7    St. Vincent for the Government.

8            THE COURT:  Good -- good morning again, Ms. St.

9    Vincent.

10           And, Mr. Carey, that appears to be you, sir, on

11   the video?

12           THE DEFENDANT:  Yes, your Honor.

13           THE COURT:  All right.  And do I have the

14   securities file?

15           THE CLERK:  Yes, your Honor.

16           THE COURT:  And is the Federal Defender

17   representing Mr. Carey?

18           THE CLERK:  He is.  He just stepped out.

19           THE COURT:  Okay.  Your counsel stepped out for

20   just a moment.  We'll wait until he returns, except I want

21   to ask you to make sure you can see me and hear me and hear

22   Ms. St. Vincent when she spoke?

23           THE DEFENDANT:  Yes, your Honor.

24           THE COURT:  All right.  Very well.

25       (Pause.)

2

1        THE COURT:  All right.  Mr. Grantham, we have

2  called the U.S.A. versus Austin Carey case, and we -- your

3  client has identified himself.  He's appearing by video.  If

4  you will identify yourself.

5        MR. GRANTHAM:  Thank you, your Honor.  Assistant

6  Federal Defender, Reed -- Reed Grantham on behalf of Mr.

7  Austin Carey, who is present and appearing by video from

8  Fort Wayne, Indiana.

9        THE COURT:  All right.  Very well.  This is the

10 time set for -- scheduled for sentencing in this matter.

11 Mr. Carey was previously found guilty of delivery by air in

12 violation of 36 C.F.R. 2.17(a)(3), and of creating a

13 hazardous condition, in violation of 36 C.F.R. 2.34(a)(4).

14        It is the time now for the Court to consider

15 sentencing and impose a sentence for the offense, but I

16 would be happy to hear from the various parties as to what

17 they feel would be an appropriate sentence.  If the Defense

18 would like to proceed first, Mr. Grantham.

19        MR. GRANTHAM:  Yes, your Honor.  Thank you.

20        As this Court well knows, we had a trial on this

21 matter, and Mr. Carey was found guilty of the two counts

22 charged in the indictment.  I guess I wanted to start off

23 making a couple of comments that I think are relevant for

24 sentencing.

25        Clearly this is somewhat atypical in a case where

3

1  an individual has admitted the conduct.  In this case in

2  anticipation of the fact that this will likely be a decision

3  that will be appealed, we are going forward and prepared to

4  present mitigation, but the posture is somewhat different

5  than a case where there's a plea agreement and there's been

6  an admission to the offense.

7          As this Court --

8          THE COURT:  So I just want to make sure I'm clear.

9          MR. GRANTHAM:  Sure.

10         THE COURT:  Did you say that the Defendant had

11  admitted or had not admitted?

12         MR. GRANTHAM:  Has not admitted.

13         THE COURT:  Okay.  All right.  Thank you.  I

14  misunderstood.

15         MR. GRANTHAM:  Yeah.  An important distinction,

16  yes.

17         THE COURT:  Okay.

18         MR. GRANTHAM:  As this Court knows, criminal

19  defendants charged with offenses in this country have a

20  right under the U.S. Constitution to have their case tried,

21  in this matter, since it's a Class B misdemeanor, in front

22  of a judge or in front of a jury.

23         Mr. Carey decided to exercise that right in this

24  case.  He, as the Court may remember, had participated in

25  the initial stages of a plea colloquy at some point and was

4

1 through the reiteration of his rights under the

2 Constitution, made a decision that he wanted to exercise his

3 right to have the Government prove their case beyond a

4 reasonable doubt, and that's why we're here today.

5        In light of the fact of his conviction, I would

6 like to address some of the 3553(a) factors for the Court

7 that may be relevant.  As the Court knows, under 3553(a),

8 the Court may consider the nature and circumstances of the

9 offense as well as the history and characteristics of the

10 Defendant.

11        Some background information relating to Mr. Carey,

12 he is a 26-year-old man.  He grew up in Fort Wayne, Indiana,

13 where he is currently living right now.  He's currently

14 living with his mother.  He has no other siblings.  He does

15 have a half brother, but they don't have much contact.  His

16 father, unfortunately and tragically, passed away when he

17 was several months old.  Actually, it was a result of a

18 motorcycle accident.  So he has not had that presence in his

19 life.

20        Mr. Carey graduated high school, and he attended

21 several years of community college.  He studied paralegal

22 studies originally and then made the transition and started

23 studying business administration.  His desire in part at

24 least to study business administration is a reflection of

25 his future hopes and dreams that he can run his own

5

1  business.  It's something that would mean a lot to him.  He,

2  as I will go into in some more detail, is an avid outdoors

3  man.  He's done mountaineering trips.  He would like to work

4  in some capacity as a mountain guide wherever that may be or

5  at some point run his own business doing that activity.

6        I guess -- I mean, the Government I'm sure will

7  mention this as well.  Mr. Carey has no prior criminal

8  history.  He has nothing to speak of, no convictions related

9  to other offenses.  He's here today 26 years old, and this

10  is his first conviction for these two offenses.

11        Mr. Carey is someone who grew up -- though he grew

12  up in Indiana, he at a relatively young age started spending

13  some time out in California and out west, which in large

14  part fueled his love and passion for the west, the outdoors,

15  and mountains.  It means quite a deal -- quite a big deal to

16  him spending time in the outdoors and going on adventures.

17  He is -- as I mentioned earlier, he has completed two years

18  of community college.  He made a conscious decision that he

19  wanted to pursue some of these activities in lieu of

20  finishing his education.  When I asked what kind of jobs

21  have you held, it's run the gamut.  This is really someone

22  who has taken on whatever jobs he could and whenever he

23  could, to help fund and support himself in pursuing his

24  passions.  He has informed me he worked at a zip line park,

25  as a personal trainer.  He's detailed cars.  He's done tree

6

1  service.  He's done catering and food service, and he even
2  did some environmental cleanup work in Indiana for a time.
3  All that to say is he is someone who has in large part in
4  the last several years held various jobs and in large part
5  to fuel his desire to spend time in the outdoors, which is
6  something that is incredibly personal, meaningful, and is
7  what he has devoted a lot of his life to.
8          Mr. Carey has traveled to various parts of the
9  west, particularly in Idaho, Wyoming and Utah, and that is
10 where he finds his -- his meaning in life.  That's where he
11 satisfies that part of him that -- that is the most
12 meaningful.  I mean, he could make a lot of decisions in
13 life, and we all do.  We all make decisions about what to
14 study, what to pursue, what type of career to pursue.  Mr.
15 Carey, this is something that has been his passion for
16 several years.
17         In the short term, he does hope to try to obtain
18 work as a mountaineering guide, something he has done on the
19 side here and there in the past, and in the long term his
20 goal is to own his own business.  This is the person that's
21 here today to be sentenced.  He comes from a relatively
22 small family.  His mother is present, as I understand it,
23 there in Indiana with him today.  They have a good
24 relationship.  She apparently is very supportive of him.
25

7

1        As a side note, Mr. -- Mr. Carey has spent time in

2   Yosemite.  He has participated in Yosemite Facelift in the

3   past.  He does have a love for this park, as he does for all

4   outdoor places that he can spend time and grow as a person.

5   I have -- I can address other questions if the Court has.  I

6   just want to put forward a little bit about Mr. Carey as a

7   person, his life, his history.

8        In terms of an appropriate sentence in this case,

9   I have evaluated several different sentences and cases

10  related to what we're referring to as based jumping.  There

11  are cases where the fine has been up to $5,000 and as low as

12  $1,000.  The standard resolution, as I understand it, is

13  roughly $4,000.  Now, that said, I would ask the Court to

14  consider and look to other sentencing schemes that we employ

15  here in the park for activities that are, I would argue,

16  substantially more dangerous to -- not just to the person

17  but to others, including drunk driving, including possession

18  of narcotics.  Many of those offenses we don't go higher

19  typically unless there's some extenuating circumstances than

20  about 22, 2400, and that's say for a second time DUI.

21       Personally and as a representative on behalf of

22  Mr. Carey, a $4,000 fine is incredibly significant.  For

23  someone who is trying to make his way, this sends a stern

24  message that he will have to pay -- with a $4,000 fine -- a

25  lot of people don't have that kind of money.  I would

8

1 propose a lower fine, probably in the 25 to three thousand

2 dollar range.

3          Mr. Carey complied after -- complied in all parts

4 of the -- the arrest.  He did not -- he did not run from the

5 officers or rangers.  He did not otherwise try to impede

6 that investigation.

7          I would also note that the cases that I've seen

8 that included a $5,000 fine and any imposition of custody

9 time involved individuals who were either intoxicated or had

10 to be restrained, who fled or ran and whose offense was I

11 believe a second -- at least a second time offense.  As I

12 stated before, Mr. Carey has no prior criminal history

13 related to any activity but specifically related to this

14 activity as well.

15          And with that I would submit.  I'm happy to answer

16 any other questions.

17          THE COURT:  All right.  Let me ask some of those.

18 First of all, I'm assuming that you are correct when you

19 tell me that Mr. Carey has not had any previous offenses.

20 There is at least hearsay evidence from a newspaper article

21 that suggests that this was far from his first venture into

22 base jumping in Yosemite.  Would you care to comment on

23 that?

24          MR. GRANTHAM:  Your Honor, I -- I have read the

25 article.  I was not familiar with the content of it.  All I

9

1  can say is there are some things in this article that I find

2  questionable in terms of the liberties taken by the author

3  who appeared to want to sensationalize this matter,

4  including with the -- the headline, and I think there are

5  some things in the article which suggest not fully

6  understanding of what was happening here today.  In terms of

7  the alleged admissions that are in there, I have no further

8  comment on them.

9          THE COURT:  All right.  Do you know what

10  precipitated that particular coverage?  Was it your client?

11          MR. GRANTHAM:  I'm not at liberty to say, your

12  Honor.

13          THE COURT:  I'm sorry?

14          MR. GRANTHAM:  I'm not at liberty to say.  It

15  would involve conversations with my client.

16          THE COURT:  All right.  Is your client currently

17  employed?

18          MR. GRANTHAM:  He was currently -- I guess --

19          THE COURT:  That's an oxymoron.

20          MR. GRANTHAM:  Well, I'm just trying to get it

21  straight because we did -- I did speak with Mr. Carey about

22  this.

23          THE COURT:  And I don't mean to embarrass you, but

24  he was -- he was currently is not a good way to start.

25          MR. GRANTHAM:  No, no, no.  He had been working

10

1 doing tree service.  I'm just not entirely sure if that is

2 ongoing.

3          THE COURT:  All right.

4          MR. GRANTHAM:  Tree service work in Indiana for a

5 company.

6          THE COURT:  Do you have any idea how he would be

7 able to -- or if he would be able to pay a fine if a fine

8 were imposed?

9          MR. GRANTHAM:  he would -- he would continue to do

10 odd jobs as he's done in the past and have supported his

11 trips.  He did just sell a vehicle that he had.  He has

12 informed me that it is something he would be able to do.  He

13 would make sure to do it, and he would basically have to

14 just make sure he worked for it.  He is currently living in

15 Fort Wayne, Indiana with his mother, as I understand it, not

16 paying any rent.

17          THE COURT:  All right.  All right.  Mr. Carey, you

18 may speak if you wish to.  You can say anything you want

19 with regard to this matter.  You have no obligation to speak

20 at all.  It's entirely up to you.

21          THE DEFENDANT:  Thank you, your Honor.  I'm going

22 to leave it to my attorney to speak.

23          THE COURT:  All right.  Very well.  Let's see what

24 Ms. St. Vincent has to say.

25          MS. ST. VINCENT:  Thank you, your Honor.  Just

11

1 very briefly and very quickly, I believe -- maybe I

2 misunderstood what defense counsel was saying about the

3 right to a jury trial and that the Defendant had waived this

4 right to a jury trial.  I believe in petty offenses there is

5 no right to a jury trial or a trial before a district judge.

6          MR. GRANTHAM:  Yeah, I apologize.  I think I maybe

7 misspoke.  I was referring to he had a right to a bench

8 trial, not a jury trial.

9          THE COURT:  All right.

10          MR. GRANTHAM:  But just criminal defendants

11 generally have a right to a trial.

12          THE COURT:  All right.  I see.  I understood it as

13 such.

14          MS. ST. VINCENT:  Your Honor, I -- first, so first

15 I would just like to reiterate that the facts of this case

16 alone are egregious and dangerous.  As the Court is well

17 aware, Mr. Carey knowingly, illegally jumped into Yosemite

18 Valley and perhaps fortunately got stuck in a tree, because

19 if he hadn't gotten stuck in the tree, he would have landed

20 where his gear landed, which was on an occupied tent cabin

21 which had completely unsuspecting visitors asleep in it.

22          THE COURT:  Is there evidence before me that it

23 was occupied and they were asleep?  I don't remember that.

24          MS. ST. VINCENT:  I believe that the rangers

25 indicated that it was occupied and they had to evacuate the

12

1 area.

2          THE COURT:  All right.  Surely, if he had not

3 landed on the tree and had, in fact, landed on the tent

4 cabin, that would have involved -- could have involved

5 serious injury not just to himself but to other people, and

6 in landing in the tree, he then needed to be rescued, which

7 exposed workers to further danger to rescue him.

8          And everything that we have heard today about Mr.

9 Carey is about what brings Mr. Carey pleasure, but it

10 doesn't go anywhere to Mr. Carey's actions in pursuing those

11 pleasures, which are both dangerous and illegal.  I think in

12 considering the 3553 factors, the first three factors are --

13 are the -- the main things to be considered here.  Under

14 2(a), one of the factors is to reflect the seriousness of

15 the offense.  And, again, while misdemeanors, the -- the

16 seriousness I think is indicated in -- in the knowing nature

17 and in the danger posed.  To promote the respect for the

18 law --

19          THE COURT:  Let me ask you about that.  I do

20 recall that there was an argument by counsel at trial that

21 the risk of -- of harm from the offense is no greater than

22 that from other activities that are allowed in the park.

23 That seemed to have been kind of the theme or maybe that was

24 in the newspaper article, but I wonder if that doesn't

25 impact the evaluation of seriousness that -- that there's

13

1 been a policy decision, a legal decision not to allow this,

2 but if -- if the Court were to conclude that it was no more

3 egregious or dangerous an activity than some of the other

4 activities, climbing, free climbing and the like, would that

5 impact the seriousness factor or would it affect -- should

6 it impact my evaluation of the seriousness of the offense?

7          MS. ST. VINCENT:  I don't -- I don't believe so,

8 your Honor, in that I think when they say offense, they mean

9 violation.  So not action.  So not the seriousness of an

10 action but the seriousness of the offense.  So I would say

11 that if you are considering offensive, I don't -- I don't

12 know that in order for something to be serious that it has

13 to be more or less serious than another violation.  Defense

14 counsel had indicated that this is less serious than DUI,

15 and I think there's some argument to make there, but I don't

16 think it has to be if this is serious, then this is not.

17 It's a stand-alone offense.  This is a -- so it's not --

18 it's not in context of other actions but in other

19 violations.

20          THE COURT:  All right.

21          MS. ST. VINCENT:  The second part of (a) is to

22 promote respect for the law, and here is I think a good

23 place to talk about the newspaper article.  I do have a

24 newspaper article.  I believe it is appropriate for the

25 Court to consider other things besides evidence given in --

1 at trial in sentencing, and because this is a published news

2 article, I think the Court can consider it without anything

3 further than submission of it.

4         THE COURT:  Counsel?

5         MR. GRANTHAM:  I have -- I mean, I have no

6 objection to it.  It sounds like your Honor has already read

7 it or had access to it.  So I'm not sure.

8         THE COURT:  All right.  And you're free to refute

9 if and as you see fit.

10         MS. ST. VINCENT:  In that newspaper article they

11 quote -- they say that in accordance with the newspaper

12 article Mr. Carey said he has base jumped in Yosemite at

13 least 20 times in the past five years.  That -- and further

14 in it he says that he is doing it to draw attention to an

15 injustice that will lead to legislation that will allow base

16 jumping in Yosemite.  That shows a clear knowledge that it's

17 illegal.

18         So there is no respect for the law in knowing that

19 it's illegal and proceeding to jump 20 times and admitting

20 to a newspaper that you did such.

21         Finally, in that section, provide just punishment

22 for the offense, I think that's very similar to the first

23 one, which is that it goes to what -- what risk the conduct

24 created for the public at large.

25         The second section of (b)(2) is to afford adequate

15

1  deterrence to criminal conduct.  Your Honor, I think the

2  sentence here has to be significant because, as we have seen

3  by the arrest here and by the admission of previous illegal

4  activity, the Defendant has shown a willingness to flaunt

5  the law, and so there has to be something besides the

6  knowledge that it's illegal to provide a deterrence to

7  further breaking the law.

8          And the last is to protect the public from further

9  crimes by the Defendant, and I think in this case that's --

10 that's pretty obvious what the -- what the risk to the

11 public is and why his actions need to be deterred.

12         Again, your Honor, I think that the base jumping

13 in Yosemite is a well known activity.  I think the penalty

14 associated with base jumping in the base jumping community

15 is pretty well known.  There is an expectation that there

16 will be a very high fine and that you may forfeit your gear.

17 That I think has been the standard for years.  I think

18 that's very well known in the community, and yet that was

19 not a deterrence to Mr. Carey.

20         So the high end, as Mr. Grantham indicated, was a

21 $5,000 fine.  And I'd like to come back to that case in a

22 minute because I think it mirrors this case very closely.  A

23 $4,000 fine is standard, and he mentioned a case where there

24 was a $1,000 fine, and I'd just like to describe why that

25 case was significantly different than this one.

16

1        In that case two people had jumped.  One of them
2 was seriously injured.  And the non-injured party found
3 rangers and asked them to assist, and in the process of that
4 turned himself in.  Without that person approaching rangers,
5 there would be no knowledge of the jump.  And so because of
6 that, that's why the fine in that case was lower.  That's a
7 significantly different case than the one at hand.

8        The case I think that is closest to this case is
9 the case of Amon McNealy (phonetic), which as -- as Federal
10 Defender pointed out, he is correct that Mr. McNealy was
11 sentenced by this Court for base jumping twice.  The first
12 time was in 2010 he pled guilty to base jumping and
13 interference.  He was sentenced to 24 months of probation, a
14 $4,000 fine, and his gear was returned to him.

15        A little over a year later, in October of 2011, he
16 again pled guilty to base jumping.  The Court's sentence was
17 an extension of probation from that day for an additional
18 two years, that he serve 20 days in custody, and the fine
19 was increased $5,000, and the forfeiture of gear was
20 ordered.

21        THE COURT:  To $5,000?

22        MS. ST. VINCENT:  To $5,000, yes.  So it was
23 increased by $1,000.  In between those two arrests, Mr.
24 McNealy had given a newspaper interview where he took a
25 newspaper reporter out of our jurisdiction on a jump, and

17

1 during that -- that newspaper interview admitted that he

2 illegally base jumped and knowingly did this.  So I think

3 the similarities to the two cases are striking.

4          In Mr. Carey's case, I think that while this is

5 the first conviction for this, I think the Court can

6 consider this is not, by his own admission, his first

7 violation of this law.  In fact, by his own admission -- or

8 his admission and the Court's conviction, this is at least

9 his 21st violation of this law.

10          So, in light of that, the Government would

11 recommend a -- oh, and then I would just -- I would

12 recommend a sentence in accordance with the McNealy

13 sentence, and that is for a fine of $5,000, 20 days in

14 custody, 24 months of unsupervised probation, and a

15 forfeiture of all the gear that is currently in custody.

16          Additionally, your Honor, there is an issue of

17 restitution.  The Government is prepared today to proceed

18 with a restitution hearing.  We do have somebody here who is

19 -- can -- we are prepared to take testimony for, although I

20 think that the Defense has a right to a separate restitution

21 hearing.

22          THE COURT:  Well, let me ask you this.  Has the

23 Defense been provided with any indication of what the

24 evidence would be with regard to the restitution?

25          MS. ST. VINCENT:  Yes, your Honor.

18

1      THE COURT:  And does the Defense wish to challenge
2 the Constitution?

3      MR. GRANTHAM:  The Defense does wish to challenge
4 the total amount of the restitution, yes.

5      THE COURT:  All right.  Well, I think it would be
6 appropriate to delay that to give them an opportunity.  So
7 we will continue that portion of the -- of the sentence to a
8 date to be determined to determine the amount of
9 restitution, if the Court orders restitution.

10      All right.  Final word, Mr. Grantham?

11      MR. GRANTHAM:  Thank you, your Honor.  There are
12 -- just a couple of other comments related to this same
13 instance, comments on this case.  And, again, Mr. Carey has
14 up and to this point and continuing to this point not
15 admitted this -- this conduct or this violation, but when
16 Ms. St. Vincent talks about the seriousness of the offense,
17 I did have someone in my office as well as myself do quite a
18 bit of research, just looking into base jumping deaths, the
19 seriousness of it, the impact of it to third parties.
20 Certainly there's no denying that there is an inherent
21 riskiness in the activity.

22      I would note that since from -- as best as I can
23 tell from the records that I've been able to see, from 1999
24 to the present, so roughly a period of about 18 years, there
25 have been two base jumping deaths in Yosemite, and those

19

1  were two people jumping at the same time, and this happened

2  -- I think it as in 2015.  Outside of that, I've also been

3  unable to find a single case where a wing suit base jumper

4  or a base jumper landed on another person.  Certainly base

5  jumping seems to put the person who's doing it at risk, and

6  I'm in no way trying to minimize the fact that sometimes

7  people have to be rescued, but there is some kind of --

8  feels like a boogeyman in terms of a base jumper actually

9  landing on another individual, which from what I can see has

10 not happened or not been reported.

11        So -- and just in terms of the seriousness of the

12 offense, again, relating it to conduct such as a DUI,

13 there's a phrase in law school that refers to something

14 that's bad in and of itself.  I forget.  It's malum -- it

15 occurred to me while I was up here, but --

16        THE COURT:  Malum per se maybe.

17        MR. GRANTHAM:  Malum -- there's a -- it's

18 something that's bad in and of itself, and that's an

19 activity.  Certainly drinking and driving I think would fall

20 under that.  Doing something harmful, attacking another

21 person would fall under that.  Not to minimize base jumping

22 in general, but there is a certain connection that these

23 individuals feel with the activity and the sport that I

24 think comes from a good place.  Whether or not it is within

25 the interest of the park, clearly not.  And whether or not

1 it's prohibited, clearly not.  It clearly is prohibited for

2 various reasons, but in terms of the seriousness of the

3 offense, I think we want to look at that as well.

4          In terms of the adequate deterrence and promoting

5 respect for the law, the only thing I'll add here -- and,

6 again -- and this goes to the comparison to the McNealy case

7 -- we're talking about a first offense, a first conviction

8 here.  Even someone in State Court charged with a first -- a

9 first offense for anything, whether or not they may have

10 gotten into fights previously or been drinking and driving

11 at other times, courts take that into account, and I think

12 it's worth taking into account that this is the first not

13 just related to whatever this conduct may or may not be but

14 related to anything that he's ever done in his life, and I

15 think that that is relevant, especially when we're talking

16 about comparing it to someone who engaged in this -- who was

17 convicted of this on two different occasions.  This has been

18 -- I mean, this is a big experience for Mr. Carey.  He's not

19 been in court like this before.  This is a shock, to say the

20 least.  He is trying to find his way through this process

21 and this system.  It is a deterrent in and of itself having

22 to go through these proceedings and having to deal with this

23 case.  Certainly, someone who had already went through it,

24 willfully did it again -- and I don't know which case it

25 was, but I believe he did have to be restrained, and he fled

21

1 in that particular case.  I don't think we have that here.
2 We have a young man who is deterred in and of itself by the
3 -- by this process, who will be deterred by a -- what I'm
4 guessing would be a punitive fine amount, and certainly he
5 is on notice in this park and in this valley, and I think
6 Mr. Carey will be able to prove to us that he can remain
7 above board for whatever period of probation the Court
8 determines.

9          And, again, in terms of the McNealy matter, I
10 don't know about his prior criminal history.  It's my
11 understanding he was a much older man, but that is also
12 something that we take into account when we're sentencing
13 someone, and so I would ask the Court to consider that.

14          THE COURT:  All right.  Any -- any reason why I
15 should not proceed with sentencing at this time?

16          MS. ST. VINCENT:  Not from the Government, your
17 Honor.

18          MR. GRANTHAM:  Nothing from the Defense, your
19 Honor.

20          THE COURT:  All right.  Let me make some not
21 random but some observations in no particular order.  Based
22 upon everything I've heard and considering all the 3553
23 factors, I think the -- the best thing that can be said in
24 Mr. Carey's behavior is that he is young and perhaps naive.
25 There's a clear indication before the Court that Mr. Carey

22

1  has engaged in this activity for sometime, reportedly told a

2  reporter he had done it some 20 times before, and that he

3  was on perhaps a crusade to see the law changed or see the

4  -- or have people's attention drawn to this matter in the --

5  what he may perceive as the unjustness of the law

6  prohibiting base jumping as compared to the law allowing

7  other presumably dangerous activities.

8          I say naive in that, as I indicated, I think in

9  the decision on the guilt phase that absent a constitutional

10  challenge -- and there was none here -- this is not the

11  place to change the law.  I don't have the power to change

12  the law or to rule it unenforceable unless there is a valid

13  constitutional challenge to it.  So that observation too is

14  consistent with the fact that, despite the overwhelming

15  circumstantial evidence, I have said on many occasions I

16  don't think we'll ever find a better example of a

17  circumstantial evidence proving beyond a reasonable doubt

18  the guilt of the offense.  But, notwithstanding that

19  overwhelming evidence, which had to be known to the Defense

20  and to the Defendant, the Defendant chose to bring this

21  matter to the Court, which is his right and he is not to be

22  punished for that, and he will not be, and to the extent he

23  did that to bring attention to it, that is -- that's a

24  choice that he made.  But it does have an effect.  It does

25  bring attention to it.  So many people are wondering what's

23

1  going to happen.  Here's this young man who simply thought

2  that this was a valid proper activity, and he's kind of

3  challenged the court and the justice system to either

4  endorse it or -- or reaffirm the penalty for it.  And he has

5  created an exploitation I think that something needs to be

6  done to deter such behavior as the Government argued I

7  thought quite well and I had not really thought of it from

8  this standpoint or from this perspective, but I -- I agree.

9  I think -- I think I can judicially notice that there is --

10 without having it be a major factor in this case, but the

11 word is out that base jumping is prohibited here.  I think

12 most people know that.  Most base jumpers know that.

13 Nevertheless, there are indications that it's an ongoing

14 activity.  Mr. Carey may have been one of the perpetrators

15 according to the report in the newspaper.  He continued to

16 base jump knowing it was illegal and -- and reportedly did

17 it some 20 times.  So what we've done to date hasn't been

18 enough to deter base jumping, and deterrence, of course, is

19 a factor to be considered under 3553.

20        When I talk about naivete, I -- I don't begrudge

21 Mr. Carey his sense of social justice.  I don't know whether

22 the base jumping law is -- is a good law or a bad law, but

23 we are here to enforce the law, and I -- you know, many

24 people in our society have successfully brought attention to

25 the law by violating it, and we have many examples in the

24

1 history of our country and elsewhere.

2          There's a difference, though.  Those people did
3 bring attention.  They openly violated the law and then
4 stood and waited to be arrested and -- and punished for it,
5 to bring attention to it.  It appears to me that there's a
6 difference between that noble enterprise, arguably noble
7 enterprise, and Mr. Carey jumping and -- 20 times and
8 continuing to do it until he got caught.  In other words,
9 he's only here not as a part of social protest, because he
10 happened to get caught when he did not want to get caught
11 I'm going to assume.

12          So looking at the factors, let me go through them
13 myself.  The seriousness of the offense, that's a tough one
14 in this case.  I think Mr. Grantham makes a -- a good point
15 in that there are other more serious offenses, that they are
16 punished sometimes more severely.  That to me in this case
17 is somewhat of a neutral factor.  I don't know that it
18 really impacts me one way or the other other than it is an
19 offense.  It is a -- a regulation that was violated.  It had
20 to have been violated knowingly.  The Defendant has been
21 convicted of the offense.  He's never admitted that he did
22 that.  He's not taken responsibility for it.  It is an
23 offense.  It is a misdemeanor.  It is no more -- the
24 seriousness of it is not going to cause me to increase or
25 decrease the penalty in any way.

25

1           The need to promote respect for the law, it's hard

2  to think of a better example where we have a history of

3  violating the law, notwithstanding the threat as Ms. St.

4  Vincent mentioned, of forfeiture of equipment and heavy

5  fines and even custody time, and it didn't work.  Obviously

6  we need to do something to get people's attention.

7           To provide a just punishment, again, I think we've

8  got to get this point across that there is punishment for

9  such offenses.  Base jumping is illegal in the national

10 parks.  It is prohibited in the national parks.  There are

11 places apparently where it is not.  Why one would insist

12 upon continuing to base jump or to base jump at all in a

13 national park -- and, again, forgetting about the newspaper

14 article.  I'm going to -- I think it's reasonable -- a

15 reasonable person would assume that Mr. Carey did not get

16 caught on the first and only time he ever base jumped.  Now,

17 logic just suggests that's probably not -- not true.

18          Now, we need to tell Mr. Carey that he needs to be

19 punished for this knowing intentional act.  There is no way

20 to engage in this behavior absent intentionally.  We need to

21 protect the public.

22          There is a difference, I think, when it comes to

23 national parks, and perhaps that is why the National Park

24 Service prohibits -- or its regulations prohibit base

25 jumping.  And Yosemite is the -- the perfect example.  This

26

1  is such a heavily visited park.  There are so many people,

2  so many residential areas, so many trees in the valley.  I'm

3  assuming based upon what happened here that even a good base

4  jumper cannot control complete his landing site, and, of

5  course, we did have two deaths where people couldn't control

6  their flight, two very experienced, reportedly very

7  experienced base jumpers.  So that exposes tourists to risk.

8  That exposed people to great risk here.  I mean, the idea of

9  having -- I'm assuming Mr. Carey weighs -- I don't know,

10 I'll estimate 125 pounds.  Having a 125-pound object fall

11 through a canvas roof of an occupied cabin from a height of

12 some 135 feet, that -- that's scary.  That is harm.  That is

13 public harm, and it does need -- we do need to protect the

14 public.  We do need to protect the people in Yosemite

15 National Park from the risk of such behavior.  Even if it

16 hasn't happened a lot or at all, the risk is there.  Mr.

17 Carey's case is the perfect example of where that danger

18 exists.

19         And, as I said, we need to deter a repetition of

20 this conduct.  So I take the offense, the conviction very

21 seriously, and for all those reasons I think we do need to

22 impose a significant sentence.  Now I just need to figure

23 out what it's going to be.

24         I think for the reasons that the Government argued

25 and the reasons that I mentioned here, the maximum fine of

27

1 $5,000 is appropriate.  I think a period of at least two --

2 I was thinking of three months, but I think given the past

3 cases, a period of two years of unsupervised probation is

4 appropriate.  During that period of time -- and I will

5 sentence the Defendant to 24 months of unsupervised

6 probation.  During that period of probation, the -- the

7 Defendant shall obey all laws.  He shall report within seven

8 days any time he is cited or arrested for any offense, he's

9 given a ticket.  If he's arrested, even if not prosecuted,

10 even if he's ultimately acquitted, he will have seven days

11 from the citation of the arrest to notify the Court and the

12 Government of that event.  I want to emphasize that the

13 failure to report is a violation of the terms of probation

14 and would expose the Defendant to the full penalty of --

15 penalties for such a violation.

16          The Defendant will have 22 months, if he wishes to

17 take it, to pay the $5,000 fine.  And someone else can do

18 the math, but it must be paid in at least sufficient

19 installments of the same amount each month beginning 30 days

20 from today's date that will have it paid in full within 22

21 months, and all the payments are to be in the same amount.

22          I will order that the equipment used in this

23 offense be forfeited to the Government.  I will order that

24 the Defendant make restitution for the reasonable cost

25 incurred as a result of his -- the crimes that he committed,

28

1 and I believe we are left with the issue of confinement or

2 other -- other penalty.

3          It may be a bias I have.  I am not a firm believer

4 that prison or confinement in county jail is good for anyone

5 or productive for society.  Sometimes it is necessary.  This

6 could be one of the cases, but I don't think so.  I think

7 instead I will order the Defendant to perform community

8 service with a nonprofit organization that will confirm that

9 he provides that community service.  He shall provide

10 community service -- he shall provide 300 hours of community

11 service.  It shall be completed -- the community service

12 shall be completed within 22 months of the -- of this date.

13 It can be performed -- it shall be performed in no less than

14 300 22nds if I've got it right.  In other words, it shall be

15 at least proportional.  He shall not do less than a

16 proportional amount that will have it done within 22 months.

17 He can do more in any one month.  He can speed it up, but he

18 cannot delay it.

19          Does that make sense or do you understand what I'm

20 saying?

21          MR. GRANTHAM:  Is your Honor attempting to

22 prohibit something like doing 100 hours at the end or --

23          THE COURT:  I don't want it to be delayed so that

24 it is all done or a substantial portion is done at the end.

25 It shall be at least -- well, what is 300 into -- or what is

29

1 22 into 300 I should say?

2          MS. ST. VINCENT:  Your Honor, just by my
3 calculator, I came up with 13.6 hours a month.

4          THE COURT:  All right.  He shall provide 15 hours,
5 assuming Ms. St. Vincent's calculation is correct.  Is that
6 consistent with yours?  It sounds like it should be about
7 right.

8          MR. GRANTHAM:  I came out with 12.5 myself, but --

9          THE COURT:  I hereby order the Defendant to
10 perform at least 15 hours of community service for a
11 nonprofit organization each and every month between now and
12 the next -- over the next 22 months.  He can provide the
13 community service at a faster rate but not a slower rate.

14          That will be my sentence in the case.  We need to
15 set a review hearing, and I need to advise the Defendant
16 that he has an absolute right to appeal the judgment of
17 guilt and the sentence in this case.

18          Is there any reason why the appeal period on
19 anything other than the restitution should not start at this
20 time?

21          MR. GRANTHAM:  Your Honor, we would be requesting
22 under Rule 38 a stay of the imposition of the fine and the
23 probation until this is resolved.  I think we meet the
24 factors under the statute.  There's a question of law here.
25 It's an argument we can take to the District Court.  I think

30

1  it's appropriate in this case.

2       THE COURT:  And the question of law is?

3       MR. GRANTHAM:  The burden of proof as to section

4  2.17.

5       THE COURT:  All right.  Ms. St. Vincent?

6       MS. ST. VINCENT:  Your Honor, I think that whether

7  or not there is an imposition of stay -- a stay of

8  imposition, I think that we can set a restitution hearing

9  if --

10      THE COURT:  We will.

11      MS. ST. VINCENT:  Okay.  And then I don't have any

12 comment at this time on the request.  I'd like --

13      THE COURT:  All right.  I will stay imposition of

14 the sentence until this matter is reviewed by the District

15 Court and the District Court judge issues an order either

16 affirming or reversing the finding of guilt.

17      So let's set a review hearing out 23 months, first

18 of all.

19      THE CLERK:  That would be September 24th, 2019.

20      THE COURT:  2019, at 10:00 a.m.

21      MR. GRANTHAM:  Your Honor, just so I'm clear, so

22 the stay is as to the fine, community service, but is not as

23 to probation?  Because if we're setting a review hearing,

24 then it would stand to reason that he's on probation until

25 then.

*Echo Reporting, Inc.*

31

1          THE COURT:  Well, I was going to stay the entire

2 sentence.  I still would like to have a review hearing date.

3 We can bump it out if need be.  So let's go ahead and set

4 the review hearing on that date, whether it -- and then

5 we'll --

6          MR. GRANTHAM:  I'm wondering if it should just be

7 a status conference or maybe a status conference to be set

8 after the District Court decides.  I don't mean to -- I'm

9 just --

10          THE COURT:  How about this, all right, a good

11 point.  Instead of setting a review hearing, we will order

12 that the Defendant advise the Government and the Court

13 immediately of any final order from the District Court

14 either affirming or reversing the conviction and requesting

15 that a status conference be set 30 days thereafter, within

16 the next 30 days, of that order.  It will be the Defendant's

17 burden.

18          Now, we need a restitution hearing.

19          MR. GRANTHAM:  Your Honor, actually, before we get

20 to that, I do have a question related to the forfeiture.

21 I'm not sure forfeiture is provided for by the rules in this

22 particular case.  In looking at Rule 32.2 which governs the

23 forfeiture, 32.2(a) requires notice to the Defendant.

24 Reading from (a):

25               "The court must not enter a

1           judgment of forfeiture in a criminal

2           proceeding unless the indictment or

3           information contains notice to the

4           Defendant that the Government will seek

5           the forfeiture of property as part of

6           any sentence in accordance with the

7           applicable statute."

8           It seems to me -- I don't know how this has

9  initially been done in the past -- forfeiture was -- we

10 handle it in different ways in some cases.  I don't believe

11 this requirement has been met in this particular case, and

12 so I would object to the imposition of the forfeiture.

13           THE COURT:  Ms. St. Vincent?

14           MS. ST. VINCENT:  Your Honor, I believe that there

15 is a -- I don't know it off the top of the head.  So I would

16 like the opportunity to look into it further and perhaps

17 brief the Court on it, but I believe this is -- there is a

18 separate section that is a forfeiture of a -- of --

19           THE COURT:  Instrumentality of the crime.

20           MS. ST. VINCENT:  -- of instruments of the crime.

21 That's exactly right, your Honor, and I don't believe that

22 the notice requirement comes into play if it is an

23 instrument of the crime.

24           THE COURT:  I will order the Government to hold

25 the -- the equipment that was used in this offense, and we

33

1 will address this issue, if it needs to be, unless -- unless

2 the Defense agrees with Ms. St. Vincent's reading of the

3 other statute.  The two of you can discuss it, and if you do

4 not come to an agreement, brief it, and we will address it

5 at the restitution hearing.

6           So we need a date.  What, 30 days out enough?

7 It's up to you folks.

8           MR. GRANTHAM:  Okay.  Your Honor, as this Court is

9 aware, I come up here sparingly at this point.  We're

10 looking at a date the first week of December, and I would

11 just be coming up specifically for this hearing.  If we

12 could set it on a Thursday, Thursday, December 7th.

13           THE COURT:  If I'm here.

14           THE CLERK:  You're in Fresno.

15           THE COURT:  I happen to be in Fresno that date.

16           MS. ST. VINCENT:  Your Honor, the Government

17 anticipates calling multiple witnesses who are located here.

18 So it would be our preference to do it here.

19           THE COURT:  All right.  How about the afternoon of

20 the 6th?

21           THE CLERK:  You're set for the McAdams bench trial

22 on the 6th.

23           MR. GRANTHAM:  I believe that -- I won't be doing

24 that one.

25           THE COURT:  You can appear by video if you want.

34

1           MR. GRANTHAM:  What about the afternoon of the

2    5th?  That's a Tuesday.

3           THE CLERK:  That's available.

4           THE COURT:  Except we'll have an afternoon

5    calendar maybe.

6           THE CLERK:  We will have CVV that day.

7           MR. GRANTHAM:  We could set it for 3:00, 3:30?

8           THE COURT:  Fine with me.  All right.  December

9    5th, 2017, 3:00 for the hearing on the issue of restitution

10   and the propriety of the order of forfeiture.

11          MR. GRANTHAM:  And, your Honor, I would request --

12   I can do it in writing as well -- a waiver of Mr. Carey's

13   presence at that hearing.  I don't believe his testimony is

14   needed for that.

15          THE COURT:  Granted.

16          All right.  Anything else we can do in this matter

17   today?

18          MS. ST. VINCENT:  Your Honor, I -- I -- I don't

19   know, but if the -- if there is no reason I cannot, I would

20   move the newspaper into evidence as is taken into

21   consideration at sentencing, just in case it is that the

22   sentencing becomes an issue at appeal that that --

23          THE COURT:  I think it would be good to have it in

24   the record.  I think the defense counsel acknowledged that

25   it was out there.

35

1          MR. GRANTHAM:  I will say just it did appear to me

2   that there were different iterations of this article, at

3   least in terms of the online.  The heading had changed.

4   There were some changes.  So --

5          THE COURT:  I -- I will say that the one that I

6   saw was the print copy in the -- in the <u>Fresno Bee</u>.

7          MR. GRANTHAM:  Okay.

8          THE COURT:  And it appears that is what Ms. St.

9   Vincent proposes to offer.

10          MS. ST. VINCENT:  That's correct, your Honor.

11          THE COURT:  All right.  It will be admitted.

12          MS. ST. VINCENT:  Thank you, your Honor.

13          THE COURT:  All right.  Is there anything else

14   that you feel the Court should do at this time, without

15   waiving your rights but that the Court should do for the

16   benefit of your client, to protect your client's rights?

17          MR. GRANTHAM:  I believe the Court has informed

18   Mr. Carey of his appellate rights.

19          THE COURT:  If I did not, I will.  You have 14

20   days from the date the sentence is imposed, and are we going

21   to postpone that until the restitution hearing?  Interesting

22   legal issue.

23          MR. GRANTHAM:  I mean, the judgment

24   notwithstanding the --

25          THE COURT:  And there may be an appeal of the

36

1 restitution amount as well.

2          MR. GRANTHAM:  It would seem to make more sense to

3 have that restitution issue settled so that any appeal to --

4 because if it's just to the conviction but maybe also to the

5 sentence, the restitution would be something relevant.

6          THE COURT:  I'm inclined to agree.  Ms. St.

7 Vincent?

8          MS. ST. VINCENT:  I would agree, your Honor.

9          THE COURT:  All right.  Well, just for the record,

10 the Defendant will have 14 days from the date the sentence

11 is entered after the restitution hearing and considering the

12 sentence and the order on the restitution, have 14 days from

13 that date to file an appeal.  The appeal must be filed in

14 this Court, the Eastern District Court of California.  If

15 you cannot afford counsel, Mr. Carey, your Federal Defender

16 will be appointed to represent you, and I assume your

17 current counsel will continue to represent you in that

18 matter.

19          All right.  Anything else for the benefit of your

20 client that we should do today?

21          MR. GRANTHAM:  No, your Honor.  I think we've just

22 about covered it.

23          THE COURT:  All right.  How about for the benefit

24 of the Government?

25          MS. ST. VINCENT:  Nothing from the Government,

37

1 your Honor.

2           THE COURT:  All right.  There's where we stand.

3 Mr. Carey, you're free to go.  You stay in touch with your

4 attorney.  To the extent you may be needed to participate,

5 it may be necessary for you to participate in other

6 hearings.  We will give word to him.  If he can't find you

7 and you don't show up after we've told him we need you here,

8 you could be penalized for failure to appear.

9           Do you understand?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  All right.  That will be the order of

12 the Court.  Thank you all very much.

13          ALL:  Thank you.

14      (Proceedings concluded.)

15

16          I certify that the foregoing is a correct

17 transcript from the electronic sound recording of the

18 proceedings in the above-entitled matter.

19

20 /s/Crystal Thomas                    11/20/2017
   Transcriber, AAERT CERT *654      Date
21
   FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
22

23
   /s/L.L. Francisco
24 L.L. Francisco, President
   Echo Reporting, Inc.
25

*Echo Reporting, Inc.*