**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>AUSTIN LEE CAREY,<br>*Defendant-Appellant.* | No. 18-10188<br><br>D.C. No.<br>1:17-cr-00252-LJO-1<br><br>OPINION |

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, Chief District Judge, Presiding

Argued and Submitted June 13, 2019
San Francisco, California

Filed July 10, 2019

Before:  MARY M. SCHROEDER and MILAN D.
SMITH, JR., Circuit Judges, and JED S. RAKOFF,[*]
District Judge.

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the
Southern District of New York, sitting by designation.

2            UNITED STATES V. CAREY

## SUMMARY[**]

### Criminal Law

The panel affirmed a conviction for misdemeanor offenses stemming from an unlawful BASE jump in Yosemite National Park.

The panel held that the permit exception in 36 C.F.R. § 2.17(a)(3) – which prohibits delivering or retrieving a person or object by parachute, helicopter, or other airborne means – is an affirmative defense for which the defendant, not the government, bore the burden of proof.

The panel held that the district court did not abuse its discretion in deciding that the magistrate judge did not need to recuse himself pursuant to 28 U.S.C. § 455(a) after reading a news article about the trial.

### COUNSEL

Reed Grantham (argued), Assistant Federal Defender; Heather E. Williams, Federal Defender; Office of the Federal Public Defender, Fresno, California; for Defendant-Appellant.

Jeffrey A. Spivak (argued), Assistant United States Attorney; Camil A. Skipper, Appellate Chief; McGregor W.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Scott, United States Attorney; United States Attorney's Office, Fresno, California; for Plaintiff-Appellee.

## OPINION

M. SMITH, Circuit Judge:

Shortly after park rangers discovered him dangling from the branches of a tree in Yosemite National Park, Austin Carey was charged with two misdemeanor offenses stemming from an unlawful BASE jump. Following a one-day bench trial, a magistrate judge found Carey guilty on both counts.

Carey now appeals his conviction, contending that the government failed to prove each element of 36 C.F.R. § 2.17(a)(3) beyond a reasonable doubt, and that the magistrate judge was required to recuse himself after being exposed to a potentially prejudicial news article. We conclude that § 2.17(a)(3)'s permit exception is an affirmative defense for which Carey, not the government, bore the burden of proof, and that the magistrate judge's reference to the article, though perhaps imprudent, did not mandate recusal pursuant to 28 U.S.C. § 455(a). We therefore affirm Carey's conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

On the morning of September 6, 2016, law enforcement rangers in Yosemite National Park responded to a report of a person in a parachute hitting a tree. The rangers arrived on scene to discover Carey suspended in the tree's branches an estimated 130 to 150 feet above the ground. With him, the

4                   UNITED STATES V. CAREY

rangers found a harness, wingsuit,[1] and parachute—
equipment commonly associated with BASE jumping.[2]
After some maneuvering and the employment of rigging
ropes, professional tree-climbing loggers helped Carey
descend to the ground.

Once safely returned to the earth's surface, Carey was
promptly arrested and charged with violations of 36 C.F.R.
§§ 2.17(a)(3) (delivering a person or object by parachute,
helicopter, or other airborne means) and 2.34(a)(4)
(disorderly conduct by creating a hazardous condition).

The case proceeded to a bench trial before a magistrate
judge on August 9, 2017.  Although a pretrial brief filed by
the government indicated that, in order to prove a violation
of § 2.17(a)(3), it had to "establish[] beyond a reasonable
doubt" that the defendant's act was "[n]ot pursuant to the
terms and conditions of a permit," the government concedes

---

[1] In the words of the magistrate judge, "a one piece uniform with
material extending from the arms to the ribs and between the legs,
commonly used by BASE jumpers to enable gliding while in the air."

[2] We have explained that

> [t]he acronym in BASE jumping refers to the
> structures off of which enthusiasts of the extreme sport
> jump with the use of a chute: Buildings, Antennas
> (radio and television towers), Spans (bridges), and
> Earth (cliffs).  BASE jumpers have leapt from the
> Empire State Building, the Eiffel Tower, Angel Falls
> in Venezuela (the highest waterfall in the world), the
> 98-foot Christ statue in Rio de Janeiro, and the World
> Trade Center.

*United States v. Albers*, 226 F.3d 989, 991 (9th Cir. 2000).

that "[a]t trial, [it] did not offer direct evidence in its case-in-chief that Carey lacked a permit to BASE jump."

Following the bench trial, Carey moved for acquittal pursuant to Federal Rule of Criminal Procedure 29, arguing that the government failed to establish all elements of § 2.17(a)(3) because it did not prove that he lacked a permit. The magistrate judge initially denied the motion, but then withdrew the denial and indicated that he would address the motion in his written decision.

The magistrate judge issued his order and judgment on September 25, 2017, finding Carey guilty on both counts. The order included a discussion of the proper burden of proof for § 2.17(a)(3)'s permit exception, with the magistrate judge concluding, "Defendant bears the burden of proving that he was permitted to BASE jump."  It also featured a reference and citation to an article from *The Fresno Bee*, published online the same day as the bench trial, that discussed Carey's BASE jumping career and the case against him.

Subsequently, Carey appealed his conviction to the district court, again claiming that the government had the burden of proving that he did not have a permit, and also arguing, for the first time, that the magistrate judge should have recused himself sua sponte pursuant to 28 U.S.C. § 455(a) after being exposed to extrajudicial information—namely, the *Fresno Bee* article.  The district court denied the appeal, agreeing with the magistrate judge that "the permit exception in § 2.17(a)(3) constitutes an affirmative defense and that the government did not have the burden of proving the nonexistence of permit," and concluding that the magistrate judge "was not required to recuse himself pursuant to § 455(a)."

6                    UNITED STATES V. CAREY

This timely appeal followed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291.

We review de novo the denial of a motion for a judgment of acquittal. *United States v. Wanland*, 830 F.3d 947, 952 (9th Cir. 2016). "The construction or interpretation of a statute is a question of law that we review de novo." *United States v. Yong Jun Li*, 643 F.3d 1183, 1185 (9th Cir. 2011) (quoting *United States v. Cabaccang*, 332 F.3d 622, 624–25 (9th Cir. 2003) (en banc)). "Rulings on motions for recusal are reviewed under the abuse-of-discretion standard." *United States v. McTiernan*, 695 F.3d 882, 891 (9th Cir. 2012).

## ANALYSIS

### I.  Section 2.17(a)(3)'s Permit Exception

Section 2.17(a)(3) prohibits "[d]elivering or retrieving a person or object by parachute, helicopter, or other airborne means, except in emergencies involving public safety or serious property loss, or pursuant to the terms and conditions of a permit." 36 C.F.R. § 2.17(a)(3). Carey argues that, because the government did not prove beyond a reasonable doubt that he lacked a permit, it failed to satisfy its burden of proof as to each essential element of § 2.17(a)(3).

"[N]o person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). However, although "the Government must prove beyond a

reasonable doubt 'every fact necessary to constitute the crime with which [the defendant] is charged,' '[p]roof of the nonexistence of all affirmative defenses has never been constitutionally required.'" *Smith v. United States*, 568 U.S. 106, 110 (2013) (alterations in original) (citation omitted) (first quoting *In re Winship*, 397 U.S. 358, 364 (1970); and then quoting *Patterson v. New York*, 432 U.S. 197, 210 (1977)).

The dispute on appeal is therefore straightforward: Carey contends that § 2.17(a)(3)'s permit exception is an element of the offense, and thus that the government had to prove the nonexistence of a permit beyond a reasonable doubt, while the government argues that it is an affirmative defense for which Carey bore the burden of proof.

At the outset, we note—as Carey understandably emphasizes—that *the government itself* indicated in a pretrial brief that the permit exception constituted an element of the offense. In a discussion of § 2.17(a)(3), the government listed "Not pursuant to the terms and conditions of a permit" as an element that "must be established beyond a reasonable doubt" "[i]n order to prove this crime."[3] We are not obliged, however, to hold the government to this position, because "[e]ven if a concession is made by the government, we are not bound by the government's 'erroneous view of the law.'" *United States v. Miller*, 822 F.2d 828, 832 (9th Cir. 1987) (quoting *Flamingo Resort, Inc. v. United States*, 664 F.2d 1387, 1391 n.5 (9th Cir. 1982)).

---

[3] The government also included another of § 2.17(a)(3)'s exceptions—"Without emergency involving public safety or serious property loss"—in the list of elements.

Accordingly, we must ascertain in the first instance which provisions of § 2.17(a)(3) constitute elements of the offense to determine who had the burden of proving or disproving the existence of a permit.  "The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute."  *United States v. Charette*, 893 F.3d 1169, 1174 (9th Cir. 2018) (quoting *Liparota v. United States*, 471 U.S. 419, 424 (1985)).  "To determine the elements of a crime, 'the focus of our inquiry is the intent of Congress.'  We 'look to the statute's language, structure, subject matter, context, and history—factors that typically help courts determine a statute's objectives and thereby illuminate its text.'"  *Id.* (citation omitted) (first quoting *United States v. Nguyen*, 73 F.3d 887, 890 (9th Cir. 1995); and then quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998)).

In support of their respective arguments regarding the elements of § 2.17(a)(3), each party primarily relies on a single Supreme Court decision.  We briefly review each case before assessing whether any conflicts exist between them, and then discuss how the decisions apply in this case.

## A. *McKelvey*

The older of the two cases—the one to which the government cites—is *McKelvey v. United States*, 260 U.S. 353 (1922).  That case concerned a statute that provided

> [t]hat no person, by force, threats, intimidation, or by any fencing or inclosing, or any other unlawful means, shall prevent or obstruct . . . any person from peaceably entering upon . . . any tract of public land . . . or shall prevent or obstruct free passage or

UNITED STATES V. CAREY                    9

> transit over or through the public lands:
> Provided, this section shall not be held to
> affect the right or title of persons, who have
> gone upon, improved or occupied said lands
> under the land laws of the United States,
> claiming title thereto, in good faith.

*Id.* at 356. The defendants challenged the indictment against them on the ground that "the indictment contains no showing that the accused were not within the exception made in the proviso." *Id.* at 356–57. The Court rejected this argument, reaffirming

> a settled rule in this jurisdiction that an
> indictment or other pleading founded on a
> general provision defining the elements of an
> offense, or of a right conferred, need not
> negative the matter of an exception made by
> a proviso or other distinct clause, whether in
> the same section or elsewhere, and that it is
> incumbent on one who relies on such an
> exception to set it up and establish it.

*Id.* at 357. In short, the Court held that a defendant, not the government, has the burden of proving an exception to a provision defining the elements of an offense; in other words, an affirmative defense. *See Dixon v. United States*, 548 U.S. 1, 13–14 (2006) (noting "the long-established common-law rule and the rule applied in *McKelvey*," both of which require the defendant to bear the burden of proving an affirmative defense (footnote omitted)).

In the decades since *McKelvey*, our court has frequently cited to the decision when determining which party bears the burden of proof for a given statutory exception, and in doing

so has illuminated the situations where its rule is appropriately applied. *See, e.g.*, *United States v. Guess*, 629 F.2d 573, 576 (9th Cir. 1980) (referencing "[t]he well-established rule [] that a defendant who relies upon an exception to a statute made by a proviso or distinct clause, whether in the same section of the statute or elsewhere, has the burden of establishing and showing that he comes within the exception" (quoting *United States v. Henry*, 615 F.2d 1223, 1234–35 (9th Cir. 1980))).

**B.  *Vuitch***

Carey, on the other hand, relies on another Supreme Court decision: *United States v. Vuitch*, 402 U.S. 62 (1971), a post-*McKelvey* case.

There, the statute at issue read,

> Whoever . . . procures or produces . . . an abortion or miscarriage on any woman, unless the same were done as necessary for the preservation of the mother's life or health and under the direction of a competent licensed practitioner of medicine, shall be imprisoned in the penitentiary not less than one year or not more than ten years.

*Id.* at 67–68.  The Court rejected the argument that "the statute places the burden of persuasion on the defendant once the fact of an abortion has been proved," explaining that "[i]t is a general guide to the interpretation of criminal statutes that when an exception is incorporated in the enacting clause of a statute, the burden is on the prosecution to plead and prove that the defendant is not within the exception."  *Id.* at 69–70.

## C.  Reconciliation

Carey argues that "[o]n its terms, the broad language of the earlier *McKelvey* decision is irreconcilable and in direct conflict with the Supreme Court's later holding in *Vuitch*," and therefore "the broad language of *McKelvey* was abrogated by the Supreme Court in its later in time 1972 *Vuitch* decision."  He further asserts that our various opinions relying on and applying *McKelvey* "are inapposite" and "not precedent here" because "the issue of *McKelvey*'s limited abrogation by *Vuitch* was never raised or addressed in those cases."  We need not reach such a dramatic conclusion; if Carey looks before he leaps, he might see that the two decisions are not, as he claims, irreconcilable.

*McKelvey*'s general rule can be characterized as follows: if a statute includes an exception to criminal liability separate from the elements of the offense—in other words, an affirmative defense, *see Dixon*, 548 U.S. at 13–14—then a defendant, not the government, must prove the exception beyond a reasonable doubt.  *Vuitch* addresses a different scenario; it does not apply when an exception constitutes an affirmative defense, but instead when "an exception is incorporated in the enacting clause of a statute" such that the exception becomes an element of the offense.  402 U.S. at 70.  In such cases, the government must prove (or negate) the exception beyond a reasonable doubt, as it would any other element of the offense.

We find no cases holding that *Vuitch* abrogated *McKelvey*, partially or otherwise.[4]  This is not surprising,

---

[4] Indeed, the Supreme Court cited to *McKelvey* and its general rule after *Vuitch*, and did not suggest any sort of abrogation or incompatibility.  *See Dixon*, 548 U.S. 13–14 & n.9.

since, contrary to Carey's position, the decisions describe
different circumstances, and are therefore compatible. As
the Eleventh Circuit has explained, "Both the *Vuitch* and the
*McKelvey* rules are rules of statutory construction, or
'general guide[s] to the interpretation of criminal statutes,'"
to be used "when Congress has not made its intent clear."
*United States v. Steele*, 147 F.3d 1316, 1319 (11th Cir. 1998)
(en banc) (alteration in original) (quoting *Vuitch*, 402 U.S.
at 70). The *McKelvey* rule applies when a statutory
exception is an exception *to* the elements of an offense; the
*Vuitch* rule applies when the exception *is* an element of the
offense.

**D. Application**

Congress did not clearly assign the burden of proving
§ 2.17(a)(3)'s permit exception. We must therefore
determine whether the exception is best characterized as an
exception to liability under *McKelvey* or *Vuitch*, in order to
properly allocate the burden of proof.

The government argues that *McKelvey* controls here,
noting that § 2.17(a)(3) "sets out a class of prohibited
conduct and then, in a clause set off by commas and
beginning with the word, 'except,' provides for an exception
to that general rule." Carey, by contrast, contends that
§ 2.17(a)(3)'s permit exception "is incorporated within the
clause proscribing the conduct in question" and "mirrors—
both in substance and in structure—the statutory language
that the *Vuitch* Supreme Court concluded constituted an
element of the offense." We ultimately agree with the
government that the permit exception is better understood
under *McKelvey*, and that it therefore constitutes an
affirmative defense.

From a purely syntactical standpoint, the statute at issue here is distinguishable from the *Vuitch* statute and more like the *McKelvey* statute. *See Charette*, 893 F.3d at 1174 (looking to a statute's language and structure as part of this inquiry). The *Vuitch* statute contained an exception *in the middle* of the provision outlining the prohibited conduct. *See* 402 U.S. at 67–68 ("Whoever . . . procures or produces . . . an abortion or miscarriage on any woman, *unless the same were done as necessary for the preservation of the mother's life or health and under the direction of a competent licensed practitioner of medicine*, shall be imprisoned in the penitentiary not less than one year or not more than ten years." (emphasis added)). Section 2.17(a)(3), by contrast, first describes the prohibited behavior—"[d]elivering or retrieving a person or object by parachute, helicopter, or other airborne means"—and *then* offers the exception subsequently—"except in emergencies involving public safety or serious property loss, or pursuant to the terms and conditions of a permit." 36 C.F.R. § 2.17(a)(3); *see also McKelvey*, 260 U.S. at 356 (analyzing a statute that included an exception at the end of the provision).[5]

---

[5] At oral argument, the government observed that § 2.17(a)(3) is also structurally similar to the regulation we analyzed in *Charette*, which featured exceptions segregated from the elements of the offense. *See* 50 C.F.R. § 17.40(b)(1)(i)(A) ("Except as provided in paragraphs (b)(1)(i)(B) through (F) of this section, no person shall take any grizzly bear in the 48 conterminous states of the United States."). But in that case, we also observed that, "[f]ortunately, Congress explicitly addressed who bears the burden of proving that a valid permit was in force, and thus whether the exemption . . . is an element or an affirmative defense." *Charette*, 893 F.3d at 1174; *see also* 16 U.S.C. § 1539(g) ("[A]ny person claiming the benefit of any exemption or permit under this chapter shall have the burden of proving that the exemption or permit is applicable."); H.R. Rep. No. 94-823, at 6 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 1685, 1689 ("Subsection (g) . . . provided for an affirmative defense

We conclude that this purely syntactical approach is somewhat revealing, but is not dispositive.  Either statute could be theoretically rewritten to match the structure of the other, without clearly altering its meaning.    Section 2.17(a)(3) is superficially more similar to the *McKelvey* statute, but further analysis is needed.

In *United States v. Cook*, 84 U.S. (17 Wall.) 168 (1872), the Supreme Court suggested more sophisticated means of delineating a statute's enacting clause, and hence whether an exception falls within it.  The Court wrote,

> Where a statute defining an offence contains an exception, in the enacting clause of the statute, which is so incorporated with the language defining the offence that the ingredients of the offence cannot be accurately and clearly described if the exception is omitted, the rules of good pleading require that an indictment founded upon the statute must allege enough to show that the accused is not within the exception, but if the language of the section defining the offence is so entirely separable from the exception that the ingredients constituting the offence may be accurately and clearly defined without any reference to the exception, the pleader may safely omit any such reference, as the matter contained in the

---

where a prima facie violation of the Act is established whereby the holder must show that the permit or exemption is applicable.").    Here— unfortunately—Congress did not provide such clear guidance.

exception is matter of defence and must be shown by the accused.

*Cook*, 85 U.S. (17 Wall.) at 173–74. Therefore, whether § 2.17(a)(3)'s permit exception "constitutes a defense or an element of the offense under *McKelvey* turns on whether 'the statutory definition is such that the crime may not be properly described without reference to the exception.'" *United States v. Taylor*, 686 F.3d 182, 191 (3d Cir. 2012) (quoting *United States v. Prentiss*, 206 F.3d 960, 973 (10th Cir. 2000)).

The government's position—that the permit exception is not an element of the offense, and hence that the *McKelvey* rule applies—is stronger. As it correctly notes,

> [T]he exception in Section 2.17(a)(3) is both subsequent to the enacting clause prohibiting delivery of persons or objects by parachute or other means and [does] not contain[] any of the "ingredients of the offense." If one were to strike the permit exception from Section 2.17(a)(3), the prohibited activity, "delivering a person or object by parachute," would still be clearly described.

(citation omitted). This conclusion is consistent with our previous opinions interpreting *McKelvey*. Section 2.17(a)(3) "la[ys] out prohibited conduct"—the ingredients of the offense—"and then provide[s] an escape hatch exception," a construct to which we have applied *McKelvey* and its progeny. *United States v. Hui Hsiung*, 778 F.3d 738, 756–57 (9th Cir. 2015). It broadly prohibits a set of activities, and then offers a limited exception, which is evidence that the exception should be construed as an affirmative defense

rather than as an element of the offense.  *See United States v. Gravenmeir*, 121 F.3d 526, 528 (9th Cir. 1997) ("Where, as in this case, the 'statutory prohibition is broad and an exception is narrow, it is more probable that the exception is an affirmative defense.'" (quoting *United States v. Freter*, 31 F.3d 783, 788 (9th Cir. 1994))).  Consequently, we agree with the government: the exception to § 2.17(a)(3) "is not an element of the offense, but rather a narrow exception and escape hatch that Carey was required to prove."**[6]**

---

**[6]** We have also suggested "there is good reason to apply" *McKelvey* when "[i]t is far more manageable for the defendant to shoulder the burden of producing evidence" that an exception is satisfied.  *United States v. Hester*, 719 F.2d 1041, 1043 (9th Cir. 1983).  Carey argues that there are

> numerous reasons why the government is better situated to introduce such evidence: the government operates the permitting system, the government has ready access to its own records, the government can call applicable permit custodians to testify to the existence or non-existence of a permit, and the government is best situated to be the ultimate arbiter as to whether such a permit was issued.

*See United States v. Oxx*, 56 F. Supp. 2d 1214, 1220 (D. Utah 1999) (concluding that § 2.17(a)(3)'s permit exception is an element of the offense in part because "the United States, as the issuer of the permit, would be in the best position to demonstrate the non-existence of such authorization"); *see also United States v. Kaluna*, 152 F.3d 1069, 1079 (9th Cir. 1998) (noting the government's "ready access to official files and records" in a discussion of the allocation of burden of proof), *withdrawn on grant of reh'g en banc*, 161 F.3d 1225 (9th Cir. 1998).

This conclusion is not unreasonable, but neither is it obvious. Although the relative burden here might not be as clear-cut as in other cases where we determined that a defendant, rather than the government, was in a better position to supply evidence, *see, e.g.*, *Hester*, 719 F.2d

In response, Carey maintains that "there is no basis upon which one could conclude that the exception language at issue in *Vuitch* differs structurally in any meaningful way from the permit language of section 2.17(a)(3)," arguing in particular that applying *Cook* to the statute in *Vuitch* would yield the same result as here: "if one were to strike the exception language of the *Vuitch* statute beginning with the word 'unless,' the prohibited activity . . . would likewise 'still be clearly described.'"

From a purely linguistic standpoint, Carey is correct. But his conclusion ignores the extensive analysis undertaken by the *Vuitch* Court, which went far beyond mere semantics in determining how integral the statute's exception was to the offense—in other words, whether the exception was part of the offense's "ingredients."  In reaching its decision, the Court relied not only on statutory structure, but also on other considerations, legislative history in particular.  The Court wrote,

> When Congress passed the District of Columbia abortion law in 1901 and amended it in 1953, it expressly authorized physicians to perform such abortions as are necessary to preserve the mother's 'life or health.'

---

at 1043 ("It is far more manageable for the defendant to shoulder the burden of producing evidence that he is a member of a federally recognized tribe than it is for the Government to produce evidence that he is not a member of any one of the hundreds of such tribes."), it seems just as easy for a defendant to demonstrate that she received a permit as it would be for the government to demonstrate that she did not.  *Cf. Gravenmeir*, 121 F.3d at 528 ("That the government *could* 'prove the negative' in this case . . . does not mean that it would be easier for the government to do so.").  Accordingly, this consideration does not tip the scale in either direction.

> Because abortions were authorized only in more restrictive circumstances under previous D.C. law, the change must represent a judgment by Congress that it is desirable that women be able to obtain abortions needed for the preservation of their lives or health.  It would be highly anomalous for a legislature to authorize abortions necessary for life or health and then to demand that a doctor, upon pain of one to ten years' imprisonment, bear the burden of proving that an abortion he performed fell within that category.

*Vuitch*, 402 U.S. at 70 (footnote omitted).  The Court also hinged its decision in part on the unique societal niche filled by medical professionals:

> Placing such a burden of proof on a doctor would be peculiarly inconsistent with society's notions of the responsibilities of the medical profession.  Generally, doctors are encouraged by society's expectations, by the strictures of malpractice law and by their own professional standards to give their patients such treatment as is necessary to preserve their health.  We are unable to believe that Congress intended that a physician be required to prove his innocence.

*Id.* at 70–71.

These additional considerations—the history of the District of Columbia's abortion laws, societal presumptions about the medical profession, the strictures of medical

malpractice law—suggest that the *Vuitch* Court did not simply rely on syntax to find that the statute's exception was part of its enacting clause, but instead undertook a more nuanced examination of the nature of the criminal offense and the purpose of the exception. Its analysis suggests that an exception should be considered an element of the offense when it represents a broader category of behavior than the offense itself. The *Vuitch* Court assumed that, if a doctor performed an abortion, she was likely doing so lawfully, and for the health of the mother. It was therefore the government's burden to *disprove* the lawfulness of an abortion, since that exception could be assumed as a baseline in all cases.

Our court demonstrated this same principle in two 1970s opinions on which Carey also relies: *United States v. King*, 587 F.2d 956 (9th Cir. 1978), and *United States v. Black*, 512 F.2d 864 (9th Cir. 1975). These cases concerned a controlled substance statute that contained a "medical exception" permitting "authorize[d] 'practitioners' to dispense controlled substances." *King*, 587 F.2d at 962. We determined that "the Government should have been required to prove the nonapplicability of the medical exception beyond a reasonable doubt," explaining that the irrationality of the government's contrary position compelled this result. *Id.* at 964. We suggested that, when it is "shown, without more, that the defendant is a physician duly registered with the Attorney General to dispense controlled substances," then a presumption that the physician did so unlawfully "is irrational, and hence unconstitutional, because we cannot say 'with substantial assurance that the presumed fact [of nonauthorization] is more likely than not to flow from the proved fact [of distribution by a practitioner] on which it is made to depend.'" *Id.* at 964–65 (alterations in original) (quoting *Leary v. United States*, 395 U.S. 6, 36 (1969)); *see*

20                    UNITED STATES v. CAREY

*also Black*, 512 F.2d at 870–71 ("It is not 'more likely than
not' that medical practitioners registered to dispense
controlled substances do so illegitimately and are guilty of a
criminal act; common experience, we think dictates
precisely the opposite conclusion.").

Given our reading of *Vuitch*, we conclude that
§ 2.17(a)(3)'s permit exception is not an element of the
offense. The regulation's legislative history indicates that
permits were intended to be issued only in very limited and
exceptional circumstances. A park superintendent's
permitting authority was meant to be "limited to the project
requirements of a limited scope and nonrecreational nature
conducted by" either a state or federal entity or a "person
demonstrating a legitimate need that is compatible with park
purposes." General and Special Regulations for Areas
Administered by the National Park Service, 49 Fed. Reg.
18,442, 18,448 (Apr. 30, 1984) (to be codified at 36 C.F.R.
pts. 1, 2, 7). "Recurrent recreational or commercial use"—
such as Carey's recreational BASE jumping—"must be set
forth for public deliberation as a proposed rule." *Id.* In short,
the regulation "limits the operation and use of aircraft to
designated areas and *generally prohibits* the air delivery of
persons or property." General Regulations for Areas
Administered by the National Park Service, 48 Fed. Reg.
30,252, 30,268 (June 30, 1983) (to be codified at 36 C.F.R.
pts. 1–7, 12) (emphasis added).

Accordingly, when a person conducts a recreational
BASE jump in a national park, we *cannot* assume that she is
doing so legally, since the circumstances when such an act
would be permitted are exceedingly rare. To put it another
way, and to distinguish this case from *Vuitch*, although we
can presume that doctors behave lawfully and in the best
interests of their patients, we cannot similarly assume that

BASE jumpers in national parks are acting in full compliance with the law, given that recreational permits are so rarely issued.

Applying the *Vuitch* rule in these limited circumstances is consistent with our presumption that where "a statutory prohibition is broad and an exception is narrow, it is more probable that the exception is an affirmative defense" and therefore subject to the *McKelvey* rule.  *Freter*, 31 F.3d at 788.  In *Vuitch*, the exception was not narrow; lawful activity was presumed in most cases, and it was the *prohibited* conduct that the Court considered to be narrow. Here, by contrast, the prohibition against BASE jumping is broad, and the exception represents a very narrow band of cases, which indicates that the exception is an affirmative defense.

In summation, § 2.17(a)(3)'s permit exception is best understood as an affirmative defense under *McKelvey* and its progeny, not an element of the offense under *Vuitch*.  We therefore conclude, like the magistrate judge and the district court, that Carey had—and did not meet—the burden of proof at trial.

## II.  Recusal

Carey also argues that the magistrate judge should have recused himself after reading a news article about the trial prior to issuing his verdict.

### A.  Standard of Review

At the outset, the parties dispute the proper standard of review to apply to this claim.  The government urges us to review for plain error, since Carey "fail[ed] to move for recusal before the trial court."  However, as Carey notes, the

news article about his case—the source of the purported
bias—did not appear until *after* the conclusion of trial, and
the magistrate judge's reference to it was not apparent until
he issued his order and judgment.  Carey therefore could not
have moved for recusal before the magistrate judge.  Instead,
he properly appealed the conviction and sentence to the
district court.  *See* 18 U.S.C. § 3402 ("In all cases of
conviction by a United States magistrate judge an appeal of
right shall lie from the judgment of the magistrate judge to a
judge of the district court of the district in which the offense
was committed.").    The district court's order denying
Carey's appeal is the subject of this appeal, *see United States
v. Manning-Ross*, 362 F.3d 874, 875 (1st Cir. 2004) (noting
that where a conviction or sentence is rendered by a
magistrate judge, the court of appeals "has jurisdiction to
entertain an appeal only after the district court renders a final
judgment"), and Carey *did* raise the recusal issue, and so
preserved it, in his initial appeal to the district court.

Accordingly, because we are reviewing the district
court's denial of Carey's appeal, where he raised the recusal
issue at the earliest opportunity—and thus cannot fairly be
said to have forfeited the issue, *see United States v. Murguia-
Rodriguez*, 815 F.3d 566, 574 (9th Cir. 2016) ("Without a
forfeited error, plain error does not apply.")—we will review
the district court's decision on the recusal issue for abuse of
discretion.  *See McTiernan*, 695 F.3d at 891.

## B. Section 455(a)

Magistrate judges possess the power to conduct trials of
individuals accused of misdemeanors.    *See* 28 U.S.C.
§ 636(a)(3); 18 U.S.C. § 3401.   However, "[a]ny justice,
judge, or magistrate judge of the United States shall
disqualify himself in any proceeding in which his

impartiality might reasonably be questioned."  28 U.S.C. § 455(a).

"[R]ecusal is appropriate where 'a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.'" *Yagman v. Republic Ins.*, 987 F.2d 622, 626 (9th Cir. 1993) (quoting *In re Yagman*, 796 F.2d 1165, 1179 (9th Cir. 1986)).  Under § 455(a), impartiality must be "evaluated on an *objective* basis, so that what matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994); *In re Murchison*, 349 U.S. 133, 136 (1955) ("Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.  But to perform its high function in the best way 'justice must satisfy the appearance of justice.'" (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954))). "Disqualification under § 455(a) is necessarily fact-driven and may turn on subtleties in the particular case." *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008).

## C.  Application

Carey's bench trial occurred on August 9, 2017, at the conclusion of which the magistrate judge indicated that he would take the matter under submission.  On that same day, *The Fresno Bee* published an online article about Carey's exploits and trial, which began, "Austin Carey says he loves to leap from Yosemite National Park's towering granite cliffs.  Even a near-deadly plunge in 2015 hasn't stopped him from being a BASE jumper."  Pablo Lopez, *He Leaps off Yosemite Cliffs, Knowing It's Illegal.  Can His Court Case Make BASE Jumping Legit?*, Fresno Bee (Aug. 9, 2017, 1:00 PM), http://www.fresnobee.com/news/local/article166303332.html.    The article included Carey's

personal history, details of his alleged BASE jumping in Yosemite, and a discussion of the pending criminal case. *Id.* It reported that "[b]efore his trial, Carey, 26, didn't deny being a BASE jumper—someone who uses a parachute or wingsuit to fly off a fixed structure or cliff. . . . Carey said he has BASE jumped in Yosemite at least 20 times in the past five years." *Id.* The article also noted Carey's hope that "his case will draw attention to what he says is an injustice, and lead[] to legislation that will allow BASE jumping in Yosemite and other national parks," and featured a photo of an individual, purportedly Carey, leaping from Yosemite National Park's Half Dome wearing a pink wingsuit. *Id.*

The following month, on September 25, 2017, the magistrate judge issued his written order. The order made explicit reference to the content of the *Fresno Bee* article, and included a citation to it, in the introduction to its analysis section:

> The Court's role is to determine if the elements of the alleged offenses have been established and, thus, whether Defendant is guilty of either or both of them. Absent a constitutional or other challenge to the validity or enforceability of the regulations—and there has been no such challenge here—the Court will not pass judgment on the wisdom of the regulations or determine whether they are inconsistent with [Yosemite National Park's] decision not to prohibit other dangerous activities. In short, while some, reportedly including Defendant [footnote citing to *Fresno Bee* article], might like to see this case produce an endorsement of BASE jumping and/or condemnation of

> the regulation prohibiting it, and others will seek just the opposite, it will do no such thing.

The order contained no other apparent references, allusions, or citations to the article.

We conclude that the district court did not abuse its discretion when it decided that the magistrate judge did not need to recuse himself pursuant to § 455(a). It is true that the *Fresno Bee* article contained details both prejudicial—Carey's admission to the offense—and inflammatory—in his words, "expressing a knowing desire to break the law." This is particularly troubling given that Carey exercised his Fifth Amendment right to refrain from testifying at trial. But the district court articulated the correct standard under § 455(a), and reasonably concluded that "[t]here is no indication that the judge's reading of the article, which he merely indicates in passing reference in a footnote, had any bearing on his conclusion or the legal analysis such that it would show some sort of partiality to a reasonable person reading the order."

We agree that a reasonable person would not have questioned the magistrate judge's impartiality based solely on a reference to a potentially prejudicial article that had no other apparent impact on the verdict. We cannot expect judges to live as moles, roving about the limited underground landscape of the official record but never perceiving the illuminated world at the surface. In our modern, interconnected, endlessly broadcast world, complete blinders are impracticable, as a reasonable person would surely conclude. Moreover, courts have regularly held that outside knowledge does not on its own prejudice judicial proceedings. *See, e.g.*, *Liteky*, 510 U.S. at 554 ("The

fact that an opinion held by a judge derives from a source outside judicial proceedings is not a *necessary* condition for 'bias or prejudice' recusal, since predispositions developed during the course of a trial will sometimes (albeit rarely) suffice."); *Dean v. Colvin*, 585 F. App'x 904, 904–05 (7th Cir. 2014) ("Judges do not violate the Constitution by consulting their own funds of knowledge about the world, or by augmenting that knowledge. . . . No judge is required to approach a case in complete ignorance. An open mind is required; an empty mind is not."). Because a reasonable observer would conclude that exposure to the *Fresno Bee* article neither influenced the magistrate judge's verdict nor prevented him from adjudicating Carey's case impartially, he was not required to recuse himself.

Carey relies heavily on the Supreme Court's decision in *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988), and stresses that no *actual* bias is needed under § 455(a), just the appearance of it. But that decision—in which the Court addressed "facts [that] create[d] precisely the kind of appearance of impropriety that § 455(a) was intended to prevent," *id.* at 867—underscores the reasonableness of the district court's conclusion here. In *Liljeberg*, the Court considered a judge's fiduciary interest in litigation over which he was presiding, *id.* at 866–68—a far cry from the magistrate judge's passing reference to the *Fresno Bee* article in this case.

We do, however, caution judicial officers against similar uses of extrajudicial material. The magistrate judge in Carey's case served as the trier of fact, and we note that jurors who sit in that same capacity are directed to "not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it," and if they do "happen to read or hear anything touching on [the]

UNITED STATES V. CAREY                27

case in the media," must "turn away and report it . . . as soon as possible."  Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit § 1.8 (Ninth Cir. Jury Instructions Comm. 2010).   The American Bar Association places similar restrictions on judges.  *See* Model Code of Judicial Conduct r. 2.9(C) (Am. Bar Ass'n 2014) ("A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed.").  So, although we conclude that the magistrate judge avoided the appearance of bias in this case, we admonish him in the future to be more circumspect in referencing or considering facts not properly admitted into evidence.

## CONCLUSION

We conclude that Carey had the burden of proving § 2.17(a)(3)'s permit exception, and that the district court did not abuse its discretion when it determined that the magistrate judge did not need to recuse himself after reading the *Fresno Bee* article.

**AFFIRMED.**